## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**MARIETTA AREA HEALTHCARE, INC.,**
**MARIETTA MEMORIAL HOSPITAL, and**
**MARIETTA HEALTHCARE PHYSICIANS, INC.,**

         **Plaintiffs,**                        **Civ. Action No.** _2:20-cv-00639_

**v.**

**MICHAEL A. KING, and**
**MICHAEL D. ROBERTS, M.D.,**

         **Defendants.**

## <u>COMPLAINT</u>

Plaintiffs Marietta Area Healthcare, Inc., Marietta Memorial Hospital, and Marietta Healthcare Physicians, Inc. (collectively, "Memorial Health"), for their complaint against Defendants Michael A. King and Michael D. Roberts, M.D., allege, by and through their attorneys, as follows:

### INTRODUCTION

1.     More than three years ago, Defendants embarked on an effort to tortiously interfere with the business and reputation of Memorial Health, a quickly growing and well-respected healthcare provider serving patients throughout the Mid-Ohio Valley. Their plan: file a lawsuit that initiates a judicial action and federal investigation premised on flimsy accusations. Defendants — who were involved with healthcare in the area — knew word of a federal investigation would travel quickly through the valley's close-knit medical community. Plus, because of the nature of civil suits and settlements, they might even get lucky and make some money in addition to harming Memorial Health's growing success.

2.      Defendants followed through with the plan. They filed a seventy-page complaint against Memorial Health ("Underlying Complaint") — pursued via the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* — alleging that Memorial Health committed a litany of violations of federal law and requesting millions in potential damages. But despite the verbosity and wild accusations, Defendants knew that the allegations and claims in the Underlying Complaint were false, materially misstated, and unsupported.

3.      The falsity of Defendants' allegations, however, did not prevent the *qui tam* legal process from going forward. As Defendants knew would happen, the Underlying Complaint prompted a comprehensive federal investigation into Memorial Health based on their allegations. For more than three years, Memorial Health had to endure the cost and burden of being the focus of such an investigation. Knowing that the allegations were false, Memorial Health fully complied with federal investigators every step of the way.

4.      At the end of the lengthy investigation, the investigators concluded that many of Defendants' allegations in the Underlying Complaint were wrong and that Memorial Health had not violated federal law, as Defendants claimed. Although Memorial Health was vindicated, it was not unharmed. The cost alone of responding to the litigative and investigative process triggered by Defendants' Underlying Complaint exceeded a million dollars. And as Defendants had intended, that process also interfered with Memorial Health's business relationships with area physicians, disrupted its ability to recruit other physicians, and harmed its reputation.

5.      Once federal investigators cleared Memorial Health of wrongdoing and the federal government informed Defendants that it did not wish to intervene in the Underlying Complaint, Defendants realized that the jig was up — their ploy to hurt and harass Memorial Health was thwarted. In an effort to limit their liability for the untrue allegations of the

Underlying Complaint, Defendants asked the court to dismiss their lawsuit. After Defendants had put Memorial Health through years of litigation and investigation, the court ordered the dismissal of the Underlying Complaint.

6.      Now, by way of this complaint, Memorial Health seeks to hold Defendants accountable for their egregious intentional misuse of the judicial system and to recover for the extensive damages that they caused. As provided below, Defendants' illegal conduct warrants four claims against them — malicious prosecution, tortious interference, abuse of process, and fraudulent legal process in violation of West Virginia Code — and entitles Memorial Health to compensatory and punitive damages.

**PARTIES**

7.      Plaintiff Marietta Area Healthcare, Inc. is a tax-exempt, not-for-profit corporation formed under Ohio law, with its principal place of business in Ohio. Marietta Area Healthcare, Inc. is the sole corporate member of, in relevant part, Marietta Memorial Hospital and Marietta Healthcare Physicians, Inc.

8.      Plaintiff Marietta Memorial Hospital is a tax-exempt, not-for-profit corporation formed under Ohio law, with its principal place of business in Ohio.

9.      Plaintiff Marietta Healthcare Physicians, Inc. is a corporation formed under Ohio law, with its principal place of business in Ohio.

10.     Defendant Michael A. King is a former officer of Camden Clark Medical Center ("Camden Clark"), a hospital located in Parkersburg, West Virginia. By the time that he and Defendant Roberts filed the Underlying Complaint, Defendant King was no longer an officer of Camden Clark and was not in legitimate competition with Memorial Health. On information and belief, King is a resident of North Carolina and is not a resident of Ohio.

3

11.     Defendant Michael D. Roberts, M.D. is a general surgeon in private practice in Parkersburg, West Virginia. As a surgeon, however, Defendant Roberts was, like Defendant King, not a competitor of Memorial Health as he did not operate a healthcare facility. Defendant Roberts is a resident of West Virginia.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties are diverse and Memorial Health seeks to more than $75,000 in damages.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims in this action occurred in this District. Defendants' coordinated and initiated their tortious conduct within this District and many of their fallacious accusations concerned Memorial Health's business in this District.

## FACTS

### *Memorial Health's success and good reputation spurs growth.*

14.     Based out of Marietta, Ohio, Memorial Health primarily operates a hospital and a series of provider based clinics in the Mid-Ohio Valley. For years, Memorial Health has provided excellent healthcare to patients from throughout the region — both Ohioans and West Virginians.

15.     Many of Memorial Health's patients, as well as its employees, hail from Wood County in West Virginia, one of the most populous counties in the Mid-Ohio Valley.

16.     Due to its stellar reputation, Memorial Health's patient load grew, as did its need for additional top-notch physicians who could meet the growing demand for Memorial Health's exceptional care.

17.    In an effort to meet that demand, Memorial Health sought out and hired various area physicians and purchased a handful of physician practices.

18.    As Memorial Health grew, other medical professionals in the area took note of its growth and success. Some of those medical professionals approached Memorial Health about establishing connections with it, including obtaining clinical privileges to its hospital. Such privileges entitle physicians to practice at, and admit patients to, a hospital and its facilities.

*Defendant Roberts and his partners seek a closer connection to Memorial Health.*

19.    One such group of medical professionals who sought closer ties with Memorial Health was Defendant Roberts and his two physician partners at Parkersburg Surgical Associates ("PSA"), based out of Parkersburg, West Virginia. Defendants Roberts and PSA had a general surgical practice, performing all manner of surgeries for area patients.

20.    As early as the Summer of 2012, Defendant Roberts and PSA reached out to Memorial Health and began expressing an interest in deepening their connections to Memorial Health.

21.    Until that point, Defendant Roberts and PSA had largely based their practice out of St. Joseph's Hospital then Camden Clark after it acquired St. Joseph's. Around that time, however, Camden Clark had decided to stop supporting an area of the PSA physicians' surgical practice.

22.    Also around that time, Defendant Roberts and PSA began negotiations with Camden Clark about acquiring the PSA practice and employing Defendants Roberts and the other PSA physicians. In seeking acquision and employment by Camden Clark, Defendant Roberts and PSA wanted to be the exclusive provider of surgical services for Camden Clark.

23.     But Defendant Roberts and PSA also endeavored to obtain employment with Memorial Health and attempted to solicit an employment offer from Memorial Health. Not only did the PSA physicians want to explore whether Memorial Health would support the practice area that Camden Clark had decided to shut down, but they also wanted to keep their options open and to increase their bargaining power with Camden Clark.

24.     Although Memorial Health responded cordially to Defendant Roberts and PSA's efforts, Memorial Health never extended an offer of employment to Defendant Roberts or the PSA physicians. Similarly, Memorial Health never offered to purchase the PSA practice.

25.     Despite the lack of an employment relationship, Defendant Roberts and PSA did apply for clinical privileges to Memorial Health beginning around September 2012.

26.     During Memorial Health's consideration of their applications, numerous issues arose about the suitability of granting clinical privileges to the PSA physicians — e.g., one of their malpractice insurance policies had been terminated. Memorial Health accordingly requested additional information from Defendant Roberts and the PSA physicians.

27.     Because of the need for additional information, the privilege applications of Defendants Roberts and the PSA physicians were still not fully processed a year later, in 2013.

28.     Effective November 1, 2013, Memorial Health approved the application of Defendant Roberts. Defendants Roberts' application, however, was the only one of the PSA physicians to be approved.

29.     Before it could make a decision with regard to the applications of the other PSA physicians, Memorial Health received a letter dated November 15, 2013 from one of the PSA physicians. The letter requested that all of the PSA applications for clinical privileges be held in abeyance or completely withdrawn.

30.     Based on the letter's requests, Memorial Health resigned Defendant Roberts' clinical privileges and withdrew the remaining applications.

31.     Later, it became apparent why Defendant Roberts and the PSA physicians withdrew those applications:  they contemporaneously obtained a lucrative offer from Camden Clark and a guaranteed relationship as the exclusive provider of general surgical services for Camden Clark. When the PSA physicians obtained that offer, Defendant King was President and Chief Executive Officer of Camden Clark.

### *Defendants King and Roberts improperly pursue claims against Memorial Health.*

32.     Years later, after Defendant King was no longer working for Camden Clark, he and Defendant Roberts teamed up again. But this time, their efforts were aimed at harming Memorial Health and damaging its successful business and physician recruitment efforts.

33.     They decided to do so by way of the Underlying Complaint. In November 2016, Defendants filed the Underlying Complaint with the District Court for the Northern District of West Virginia, despite the inappropriateness of that venue — the venue allegations in that complaint were untrue and insufficient.

34.     Defendants' Underlying Complaint alleged that Memorial Health had violated federal law in recruiting and paying physicians and that it inappropriately submitted claims to federal healthcare programs —Medicare, Medicaid, and Tri-Care — based on those violations. More specifically, that complaint claimed that Memorial Health sought to illegally increase its business and revenue in violation of the FCA, the Stark Law, 42 U.S.C. § 1395nn, and the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

35.     Although that complaint spanned more than seventy pages and appeared to contain detailed allegations — many of which were false or materially misstated — Defendant

King later acknowledged that the Underlying Complaint was based on his unsupported conjecture about Memorial Health's success.

### *Brief background of the Stark Law, AKS, and FCA.*

36.     Together, the Stark Law and AKS prohibit hospitals from compensating physicians beyond their fair market value in order to induce patient referrals to the hospital. *See generally* 42 U.S.C. §§ 1320a-7b(b) & 1395nn.

37.     When healthcare providers submit claims to a federal healthcare program for reimbursement for medical services, the providers must certify that they have complied with the governing laws and regulations, including the Stark Law and AKS.

38.     Under the FCA, anyone — including a hospital — that "knowingly presents, or causes to be presented to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" is liable for civil penalties. *See* 31 U.S.C. § 3729(a)(1)(A). Those penalties can range from no "less than $5,[5]00 [to] not more than $1[1],000" per false claim.  *See id.* at § 3729(a). Plus, a party that submits a claim in violation of the FCA becomes liable for "3 times the amount of damages which the Government sustains because of the act of [the violating party]." *See id.*

39.     In other words, the FCA creates civil liability for penalties and damages against anyone who submits claims and is in violation of the Stark Law and AKS or who falsely certifies compliance with those laws.

40.     Although FCA empowers the government to pursue penalties and damages against violators, the FCA also enables private citizens to initiate and bring claims for violations of the statute on behalf of them and the government — referred to as a *qui tam* actions. *See* 31 U.S.C. § 3730(b).

41. The government, if it chooses, may intervene in a *qui tam* action and proceed with it. *See* 31 U.S.C. § 3730(b)(2), (c)(1). The government may also dismiss a *qui tam* action if it sees fit. *See id.* at § 3730(c)(2).

42. And if a *qui tam* complaint is substantially based on "allegations or transactions" that "were publicly disclosed" prior to the filing of the complaint, a court must "dismiss [a *qui tam*] action or claim under [the FCA]." *See* 31 U.S.C. § 3730(e)(4)(A).

43. Those who file *qui tam* actions pursuant to § 3730(b) that successfully result in the recovery of funds are entitled to as much as 25 percent of those proceeds. *See* 31 U.S.C. § 3730(d).

44. Defendants brought the Underlying Complaint pursuant to § 3730(b).

### *Defendants knowingly trigger a federal investigation based on the filing of the Underlying Complaint with its false and materially misstated allegations.*

45. As with nearly all *qui tam* complaints, the Department of Justice investigated the allegations and claims contained in the Underlying Complaint following its filing.

46. As part of the investigative process, Defendants were able to provide information to federal investigators about the allegations, claims, and accusations made in the Underlying Complaint.

47. In large part, the Underlying Complaint claimed that Memorial Health violated the FCA by seeking and receiving healthcare reimbursements from federal healthcare programs while contravening the Stark Law and AKS. According to the Underlying Complaint allegations, Memorial Health had paid certain physicians in excess of their fair market values in order to induce referrals.

48.    In filing the Underlying Complaint, Defendants asserted that they had "direct, personal, and independent knowledge that [Memorial Health] has violated federal [law] as described in detail [in the Underlying Complaint]." *See* Ex. A, Underlying Complaint, ¶ 21.

49.    Despite that certification of detailed personal knowledge, Defendants based much of the Underlying Complaint on false and materially misstated allegations and insufficiently supported claims.

50.    Some of the Underlying Complaint's false, materially misstated, and unsupported allegations include, but are not limited to:

a.    The Underlying Complaint purports to detail a July 2013 meeting between Memorial Health's Chief Executive Officer and the three PSA physicians, including Defendants Roberts. *See* Ex. A, ¶¶ 49-57. It alleges that at this meeting, Memorial Health's CEO sought to have those PSA physicians employed by Memorial Health. Despite the apparent specifics pleaded, that meeting and the supposed offer of employment extended by Memorial Health's CEO never occurred.

b.    The Underlying Complaint also contains allegations about a second supposed meeting between Memorial Health's CEO and the three PSA physicians. *See* Ex. A, ¶¶ 58-65. Those allegations again detail that Memorial Health's CEO made an offer of employment to the PSA physicians. *See id.* at ¶¶ 58,60, 64. However, no such meeting took place, and Memorial Health did not otherwise offer employment to the PSA physicians.

c.    The Underlying Complaint includes allegations about a series of emails between Memorial Health's CEO and PSA's office manager regarding the

10

malpractice insurance of the three PSA physicians. *See* Ex. A., ¶¶ 50, 66-69. Those allegations, however, are materially misstated. Contrary to the framing of the Underlying Complaint, the emails between Memorial Health's CEO and PSA's office manager neither extended an offer of employment to the PSA physicians nor were they sent in furtherance of such an offer.

d.   Paragraph 72 of the Underlying Complaint claims that Memorial Health stonewalled the PSA physicians' clinical privileges application and that due to the stonewalling, they withdrew their applications. *See* Ex. A, ¶ 72. However, that was not true or materially correct. In fact, PSA's letter to Memorial Health requested that Memorial Health either place the applications for the PSA physicians on hold — a request to extend the process — or, if a hold was not possible, withdraw those applications. In that letter, PSA also notified Memorial Health that they would reapply for privileges "at a future date when [their] call obligations allow[ed]."

e.   The Underlying Complaint alleges that Memorial Health extended a $500,000 offer to each of the PSA physicians and that the offer violated the Stark Law and AKS. *See* Ex. A, ¶ 70-71, 73. But Memorial Health never made such an offer. Indeed, it never made *any* offer of employment to the PSA physicians. According to the Underlying Complaint, Memorial Health also made similar illegal offers of employment to other physicians. *See id.* at ¶ 74. However, that too is untrue.

f.   The Underlying Complaint claims that Memorial Health had a "directorship" with members of First Settlement Orthopedics ("FSO") — an independent

physicians' group of orthopedic surgeons in the Mid-Ohio Valley — and that Memorial Health paid excessively for that "directorship." *See* Ex. A, ¶¶ 75-82. No such directorship existed, and Memorial Health never offered to, or did, excessively pay the physicians of FSO.

g.   Paragraphs 83 through 96 of the Underlying Complaint make a series of claims about Memorial Health's purchase of the pain management practice of PARS Neurosurgical Associates, Inc., a group of neurosurgeons in Parkersburg, West Virginia. *See* Ex. A, ¶¶ 82-96. More specifically, the Underlying Complaint alleges Memorial Health paid an "excessive" amount, "far beyond any fair market valuation" for the PARS practice and that after Memorial Health's purchase, the PARS physicians "drastically reduced their surgeries at Camden Clark." *See id.* at ¶¶ 89-90, 93. Those allegations, however, were untrue and materially misrepresented. Memorial Health purchased the PARS pain management practice for an amount established by a fair market valuation firm hired by Memorial Health. And despite the implication of the Underlying Complaint's allegations, PARS did not increase the number of surgeries it performed at Memorial Health after the acquisition.

h.   The Underlying Complaint also claimed that Memorial Health made "excessive" payments to another area doctor, Dr. Srini Vasan — a radiation oncologist with an office in Parkersburg, West Virginia. *See* Ex. A, ¶¶ 97-111. But various aspects of the allegations about Memorial Health and Dr. Vasan are untrue. The Underlying Complaint claims that before 2010, Dr. Vasan was a member of Camden Clark's medical staff and that, "[*s*]*ubsequent*[*t*]" to

12

discussions between Camden Clark and Dr. Vasan, Memorial Health "entered into an employment agreement with [him]." *See id.* at ¶¶ 98-101 (emphasis added). Dr. Vasan, however, had been employed by Memorial Health since 2007, before any of those supposed discussions. The complaint also alleges that Memorial Health paid Dr. Vasan "excessive[ly]" and "higher than market rates." *See id.* at ¶ 109. But that too is false. Memorial Health obtained a fair market valuation for its compensation of Dr. Vasan and paid him within the fair market value.

i.    Additionally, the Underlying Complaint claims that Memorial Health paid Dr. Curtis White, who focuses on obstetrics and gynecology, an excessive amount and that he "once practiced" in Parkersburg but by 2016 "no longer maintain[ed] a Parkersburg office and . . . no longer actively s[aw] patients at Camden Clark." *See* Ex. A, ¶¶ 112-114. Both of those allegations were false and materially misstated. Memorial Health obtained a fair market valuation for Dr. White and paid him within the bounds of that valuation. Likewise, the assertion that Dr. White did not actively see patients at Camden Clark was materially incorrect. When Defendants filed the Underlying Complaint, Dr. White still saw patients at Camden Clark.

j.    Other various statements — including that "[Dr. Leah] Hopkins has confirmed that she is not permitted for any reason to make any referrals outside of the [Memorial Health] system," that Memorial Health paid "excessive" compensation or "kickbacks" to physicians, and that "[Memorial Health] has submitted thousands of false outpatient hospital claims to the Medicare

Program for services at non-licensed West Virginia facilities" — were false and materially misstated. *See* Ex. A, ¶¶ 37-38, 43-44, 154.

51.     In sum, the bases of Defendants' allegations and claims in the Underlying Complaint, were false, materially misstated, and without support. Moreover, Defendants, who claimed to have personal knowledge of their allegations and claims, knew and certainly should have known that the Underlying Complaint contained falsehoods and misstatements.

52.     After three years of investigating Defendants' allegations — performing numerous interviews and reviewing a trove of documents — federal investigators ultimately found Defendants' allegations and claims to be unsubstantiated.

### *Defendants continued to pursue their claims even after federal investigators cleared Memorial Health and the government declined to intervene in the litigation.*

53.     Even in light of the investigators' conclusion that Defendants' claims were unfounded, Defendants maintained their litigation against Memorial Health.

54.     Due in part to the results of the federal investigation, the government declined to intervene in that litigation.

55.     Even after the government declined intervention, Defendants continued to pursue their *qui tam* action.

56.     On March 20, 2020, however, Defendants finally requested that the district court dismiss the Underlying Complaint and the *qui tam* action against Memorial Health.

57.     In order for a *qui tam* plaintiff to obtain dismissal of a *qui tam* action, the FCA requires that the government provide written consent and that the court must see fit to grant the dismissal request by way of a written order. *See* 31 U.S.C.§ 3730(b)(1). Both the government and the court must also explain their rationale for agreeing to, and granting, the dismissal request. *See id.*

58.     Based on the statutory requirement, the district court entered an order on March

23, 2020 — and later amended that order on April 24, 2020 — granting Defendants' dismissal

request.

59.     The district court's order of March 23, 2020 also unsealed certain docket entries

in the *qui tam* action, including the Underlying Complaint.

60.     Under the FCA, *qui tam* complaints and the actions they initiate generally remain

sealed during the investigation and part of the litigation. *See* 31 U.S.C. § 3730(b)(2).

61.     However, it was only after entry of the amended order on April 24, 2020 that the

*qui tam* action itself was unsealed and those docket entries became accessible to the public on the

court's online filing system.

62.     Therefore, it was after the entry of the amended order that Memorial Health could

and did discover who filed and initiated the fallacious *qui tam* action: Defendants King and

Roberts.

### Defendants' fallacious qui tam action injures Memorial Health and interferes with its ability to attract and maintain physicians.

63.     Word of the *qui tam* action, as well as its accompanying DOJ investigation,

circulated around the Mid-Ohio Valley's medical community.

64.     Although based on falsities, that action and investigation caused Memorial Health

to lose physicians who were affiliated with it and disrupted its efforts to recruit other physicians.

65.     For instance, in 2019 alone, based on information and belief, the *qui tam* action

and accompanying investigation led at least one physician to resign from her position at

Memorial Health and at least three other physicians — orthopedic surgeons — as well as a

physicians' medical group to decline offers of employment. Instead of accepting Memorial

Health's offers or remaining employed with Memorial Health, some of those physicians accepted

employment offers of other area hospitals, resigned their privileges at Memorial Health, and ceased performing procedures there.

66.     Likewise, after initiation of the action and investigation, Memorial Health experienced a higher number of failed recruiting efforts. In 2017 — the first year after the filing of the *qui tam* action — at least 9 physicians opted to decline Memorial Health's recruiting overtures. Those physicians practiced in a range of specialties, including, but not limited to, Obstetrics and Gynecology, Neurosurgery, Pulmonary Medicine, and Dermatology.

67.     As Defendants continued to pursue the *qui tam* action and the investigation dragged on, Memorial Health's failed recruiting efforts became more numerous. In both 2018 and 2019, Memorial Health saw more than 30 physicians reject its recruiting. Again, those declining physicians practiced in a range of specialties, including, but not limited to, Cardiology, Plastic Surgery, Gastroenterology, Radiology, and Oncology.

68.     The loss of medical staff and the recruiting disruptions negatively affected Memorial Health's business and hampered its ability to meet the demand for its healthcare services. As a result, Memorial Health experienced decreased revenues, higher expenses, and lost business opportunities.

## COUNT I

### MALICIOUS PROSECUTION

69.     Memorial Health repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

70.     A claim for malicious prosecution requires three elements: "(1) that the prosecution was malicious, (2) that it was without reasonable or probable cause, and (3) that it

16

terminated favorably to plaintiff." *See* Syl. Pt. 1, *Norfolk S. Ry. Co. v. Higginbotham*, 721 S.E.2d 541 (W. Va. 2011) (citation and internal quotation marks omitted).[1]

71.     Civil proceedings can give rise to a malicious prosecution claim. *See Presier v. MacQueen*, 352 S.E.2d 22, 23 (W. Va. 1985).

72.     Defendants' conduct satisfies each of the requisite elements for a malicious prosecution claim.

73.     Defendants initiated litigation against Memorial Health by way of the Underlying Complaint and pursued their allegations through the litigative and investigative processes. Defendants' prosecution of claims against Memorial Health was based on knowing falsehoods and material misstatements. And Defendants intended to harm Memorial Health, as well as to detrimentally affect its physician recruitment efforts and success. As such, Defendants' pursuit of those claims was malicious.

74.     Likewise, given that Defendants knowingly based the Underlying Complaint on falsities and material misstatements, their prosecution of that complaint was without reasonable or probable cause. Indeed, the results of the federal investigation confirm the lack of any reasonable or probable cause supporting Defendants' accusations.

75.     By court order, the action initiated by the Underlying Complaint was terminated in Memorial Health's favor. That is, the court dismissed that complaint in its entirety.

76.     As a direct and proximate result of Defendants' malicious prosecution, Memorial Health suffered damages including, but not limited to, the loss of benefits of existing and

---

[1] Syllabus points contained in the opinions of the Supreme Court of Appeals of West Virginia are of the "highest precedential value" and announce "points of law." *See State v. McKinley*, 764 S.E.2d 303, 313 (W. Va. 2014). As such, syllabus points constitute binding precedent of West Virginia law. *See id.*

prospective business relationships, reputational harm, lost business, costs and expenses associated with the investigation and litigation, and attorneys' fees.

## COUNT II

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND EXPECTANCIES

77.     Memorial Health repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

78.     Under West Virginia law, a claim for tortious interference exists where the plaintiff can demonstrate "(1) [the] existence of a contractual or business relationship or expectancy; (2) an intentional act of improper interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *See* Syl Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395 (W. Va. 2008); Syl. Pt. 2, *Torbett v. Wheeling Savings & Trust Co.*, 314 S.E.2d 166 (W. Va. 1983).

79.     "If the plaintiff's performance has intentionally been made more burdensome or more expensive by the actor, the cost that he incurs in order to obtain the performance by the third party has increased, and the net benefit from the third person's performance has been correspondingly diminished. This Section [of the Restatement] covers that loss." *Restatement (Second) of Torts* § 766A cmt. c (1979); *see also Torbett*, 314 S.E.2d at 171-72 ("rel[ying] upon the Restatement for guidance").

80.     "One who is liable to another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Restatement (Second) of Torts* § 774A (1979); *see also Bd. of Educ. of McDowell Cnty. v. Zando,*

*Martin & Milstead, Inc.*, 390 S.E.2d 796, 808 (W. Va. 1990) (relying on § 774A of the Restatement).

81.     Memorial Health had existing business relationships with physicians in and around the Mid-Ohio Valley, as well as legitimate business expectancies based on the recruitment of other physicians.

82.     Defendants intentionally, improperly, and tortiously interfered with Memorial Health's business relationships and expectancy with other physicians. Defendants were outside of those relationships and expectancies.

83.     Because of Defendants' filing the Underlying Complaint, their pursuing of its claims, and their triggering of the federal investigation that flowed from the Underlying Complaint, multiple physicians terminated their business relationships with Memorial Health and ceased their engagement with Memorial Health's recruitment efforts. Defendants knew that those events would occur and intended the resultant harm.

84.     Defendants' unlawful interference directly and proximately caused damage to Memorial Health that includes, but is not limited to, the loss of benefits of existing and prospective business relationships, reputational harm, lost business, costs and expenses associated with the investigation and litigation, and attorneys' fees. Those damages were reasonably expected to result from Defendants' interference.

## COUNT III

### ABUSE OF PROCESS

85.     Memorial Health repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

86.     The Supreme Court of Appeals of West Virginia has recognized a cause of action

for abuse of process. *See Preiser*, 352 S.E.2d at 28.

87.     Such a cause of action exists based on "the willful or malicious misuse or

misapplication of lawfully issued process to accomplish some purpose not intended or warranted

by that process." *See* Syl. Pt. 2, *Wayne Cnty. Bank v. Hodges*, 338 S.E.2d 202 (W. Va. 1985)

(citation and internal quotation marks omitted).

88.     The gravamen of an abuse of process claim is "not commencing action or causing

process to issue without justification, but [instead focuses on] misusing, or misapplying process

justified in itself for an end other than that which it was designed to accomplish." *See Preiser*,

352 S.E.2d at 28 n.8 (citation and internal quotation marks omitted). In other words, the "purpose

for which the process is used . . . is the only thing of importance." *See id.*

89.     Defendants willfully and maliciously used the judicial process for initiating *qui*

*tam* actions and civil suits by filing the Underlying Complaint based on knowing falsities,

material misstatements, and unsupported accusations.

90.     Defendants also willfully and maliciously used the DOJ's *qui tam* investigative

process — a process that lasted more than three years in this case and yielded no evidence of

wrongdoing. Defendants knowingly prompted that process based on falsities, material

misstatements, and unsupported accusations.

91.     Both the use of the judicial process and the investigative process were in

furtherance of Defendants' wrongful purpose to injure and interfere with Memorial Health's

business, as well as its recruitment and retention of physicians.

92.     As a direct and proximate result of Defendants' abuse of process, Memorial

Health suffered damages that include, but are not limited to, the loss of benefits of existing and

prospective business relationships, reputational harm, lost business, costs and expenses associated with the investigation and litigation, and attorneys' fees.

## COUNT IV

### FRAUDULENT LEGAL PROCESS IN VIOLATION OF W. VA. CODE § 61-5-27a

93.     Memorial Health repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

94.     Section 61-5-27a of West Virginia Code makes it "unlawful for a person to knowingly engage in a fraudulent official proceeding or legal process." *See* W. Va. Code § 61-5-27a(b).

95.     As used in § 61-5-27a, "'[f]raudulent' means not legally issued or sanctioned . . . including forged, false, and materially misstated." *See* W. Va. Code § 61-5-27(a)(1). "Legal process," for purposes of the prohibition in § 61-5-27a, means "an action, appeal, document instrument, or other writing issued, filed, or recorded to pursue a claim against [a party]." *See id.* at § 61-5-27(a)(2). That definition explicitly includes, *inter alia*, "a complaint," "decree," "demand, "and "pleading." *See id.* Likewise, "official proceeding" entails any "proceeding involving a legal process or other process of a [state or federal] tribunal." *See id.* at § 61-5-27(a)(3).

96.     Although § 61-5-27a is a criminal statute, the West Virginia Code expressly creates a civil cause of action against anyone who violates that section. *See* W. Va. Code § 61-5-27a(h). Anyone harmed by a violation of § 61-5-27a may pursue a civil claim against the violator for "injury or loss to person or property incurred as a result of [the violation] and for reasonable attorney's fees, courts costs[,] and other expenses incurred as a result" of the violation. *See id.*

21

97.     Defendants violated § 61-5-27a by filing the Underlying Complaint, as well as prompting, and engaging in, the resultant investigation and litigation.

98.     Defendants' violation of § 61-5-27a directly and proximately caused damage to Memorial Health that includes, but is not limited to, the loss of benefits of existing and prospective business relationships, reputational harm, lost business, costs and expenses associated with the investigation and litigation, and attorneys' fees.

## COUNT V

### PUNITIVE DAMAGES

99.     Memorial Health repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

100.     Under West Virginia law, an award of punitive damages is appropriate where defendants' conduct is carried out "with actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety, and welfare of others." *See* W. Va. Code § 55-7-29(a).

101.     As alleged above, Defendants acted maliciously and with reckless and outrageous indifference toward Memorial Health by filing and pursuing the Underlying Complaint, as well as knowingly initiating, and engaging in, the federal *qui tam* investigative process.

102.     Accordingly, Memorial Health is entitled to punitive damages.


**WHEREFORE**, Memorial Health respectfully requests the following relief:

1.  Trial by jury;

2.  Judgment against the Defendants for compensatory and consequential damages in an amount to be determined at trial, plus court costs and expenses;

3.  Pre-judgment and post-judgment interest at the maximum allowable rates at law;

4. Punitive damages against the Defendants;

5. Attorneys' fees; and

6. Any other relief to which Memorial Health may seek or be entitled to under law or equity.

**JURY TRIAL DEMANDED.**

Dated: September 25, 2020

**MARIETTA AREA HEALTHCARE, INC., MARIETTA MEMORIAL HOSPITAL, and MARIETTA HEALTHCARE PHYSICIANS, INC., By Counsel**.

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)
Isaac R. Forman (WVSB #11668)
Max C. Gottlieb (WVSB #13201)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
iforman@hfdrlaw.com
mgottlieb@hfdrlaw.com