**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MARIETTA AREA HEALTHCARE, INC.,
MARIETTA MEMORIAL HOSPITAL, and
MARIETTA HEALTHCARE PHYSICIANS, INC.,**

        **Plaintiffs,**                  **Civ. Action No. 5:21-cv-00025**

**v.**

**MICHAEL A. KING, and
MICHAEL D. ROBERTS, M.D., and
TODD A. KRUGER,**

        **Defendants.**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Driven by greed and desire to harm their largest competitor, in November 2016, Defendants crystalized a years-long effort to harm Plaintiffs.[1] Defendants did so by filing a *qui tam* complaint littered with false, materially misstated, and unsupported allegations of fraud. By way of that complaint, Defendants knowingly initiated the Underlying Action and triggered the multi-year, million-dollar investigation of Plaintiffs by federal investigators. In addition to causing Plaintiffs to incur substantial costs and stress defending the Underlying Action, Defendants also intended for word of the investigation to leak into the regional community— with their assistance, of course—and hinder Plaintiffs' ability to do business. And Defendants each hoped for a multi-million-dollar payout for their efforts to boot.

Now, despite the existence of myriad factual disputes and outstanding discovery motions, Defendants seek summary judgment on all of Plaintiffs' claims. This Court, however, has

_____

[1] On February 2, 2023, Plaintiffs and Defendant Roberts mutually resolved the matter between them, rendering Defendant Roberts' portion of Defendants' Joint Motion for Summary Judgment moot.

already considered and rejected virtually all of Defendants' arguments— at least three times.

Defendants nevertheless seek a *de facto* third reconsideration of this Court's previous orders all

the while telling the Court, falsely, that the facts are not in dispute. For instance, Defendants yet

again invoke *Goodwin v. City of Shepherdstown* as a defense to the "favorable termination"

element of malicious prosecution, even though the Court has already settled that matter in

Plaintiffs' favor *three times*. Otherwise, Defendants argue that the Court should grant summary

judgment in their favor because their lawyer and his co-counsel think that their scheme to topple

Plaintiffs' business was well-founded. This Court has already rejected a majority of Defendants'

arguments, and should do so again by denying their Motion for Summary Judgment.

## FACTUAL BACKGROUND

### A.  MMH becomes preeminent health system in Mid-Ohio Valley by providing better care for patients.

For years, MMH worked towards its organizational goal: elevating "the health status of

the region," including the Mid-Ohio Valley and the areas around Parkersburg, West Virginia. *See*

Exhibit 11, at 124-26. In the late 2000s, MMH developed a strategic plan to provide more and

better health services for the community. *Id*. In order to do that, MMH sought to care for the

aging population of the Mid-Ohio Valley by focusing, above all, on quality care. *Id.*, at 135-36.

And although there was competition in the Mid-Ohio Valley, MMH believed that such

competition was "a great thing for the community." *Id*.  Indeed, the competition made Marietta

"bring [its] A-game." *Id.*, at 36.

And bring it's "A-game" MMH did. Around the time that MMH started implementing its

plan, MMH became the leading healthcare option in the Mid-Ohio Valley in the eyes of the

community. *See* Exhibit 13, at 396. MMH's progress in that respect would continue, widening

the gap between it and its competitors. Importantly, however, MMH sought to grow the right

way. Conscientious of the Stark law and Anti-Kickback Statute, MMH imposed processes and procedures to ensure that it compensated physicians consistent with fair market value ("FMV"). Broadly, Stark and AKS prohibit hospitals from compensating physicians beyond FMV in exchange for that physician's referrals to the hospital. Not only did MMH have policies and procedures imposing requirements for permissible physician compensation, but they also had an established practice of complying with those requirements. *See* Exhibit 11, at 214-216.

MMH's physician compensation policies and practices had two components: established approval chains of command and required FMV assessments. With respect to approval, "all [physician] compensation, negotiations and offers" had to be approved by "the vice-president of clinic operations or director of business operations and physician compensation." Exhibit 11, at 216. But for physician compensation offers that would exceed certain thresholds, there were additional requirements. *Id.* at 216-17; Exhibit 16, at 18489-92. For compensation above the 75th percentile of the national measures, the offer required "additional approval of the compensation committee [of the Board of Directors], legal counsel, and supported by third-party FMV analysis." *Id.* at 217; Exhibit 16, 18489-92.

Likewise, to ensure compliance with Stark and AKS, MMH performed a FMV assessment for "every single" physician it hired. *See* Exhibit 15, at 23-24. For most physicians, MMH's compensation professionals would compare national benchmarking data for median dollar per wRVUs — "worked relative value units," a "measure of productivity or volume" "used broadly throughout the [healthcare] industry," Exhibit 11, at 207-08 — to the dollar per wRVU for the proposed physician. *See* Exhibit 15, at 20-24. But where factual circumstances were more complicated or the physician was to be paid above the 75th percentile nationally, MMH, based on its "internal compensation policy," would commission a "FMV defensibility

report." *Id.*, at 20-24. Such reports, prepared by third parties, assessed all the circumstances to determine whether a particular physician's proposed compensation was consistent with FMV based on their particular skills, practice, and circumstances. *Id.*, at 20-24.

MMH's decision to do things the right way showed. From 1998-2016, MMH was the object of only two inquiries by the Office of Inspector General or the Department of Justice, both in the 1998-2000 time frame. *See* Exhibit 14, at 32-34. For one of those inquiries, MMH was eventually fully exonerated. *Id.* The other, which dealt with the administrative handling of certain secondary payer questionnaire forms, resulted in a minor fine and a short reporting period. *Id.* However, neither of those inquiries concerned MMH's growing success and demand for its exemplary services. *Id.*, at 32-35. Indeed, MMH had never been investigated for any serious misconduct involving its growth and employment of additional physicians to meet growing demand for its services and improve its quality. *Id*. That is, MMH had never been subject of such an investigation until Defendants initiated their plan to "bring [MMH] down." Exhibit 20, at 85-86.

### B. Defendants Kruger and King develop "hate" for MMH, refuse to accept MMH's superior services, and seek to curb MMH's successes in the market.

According to Defendant King, he first suspected "some ethical issues" involving MMH's behavior in the marketplace in 2009 or 2010. Exhibit 26, at 31–32. King knew that MMH had a "strategic plan" around that time that involved building new facilities, expanding its services, and attracting new patients in the Mid-Ohio Valley. *Id.*, at 33–34, 37.

When MMH built a new facility in Belpre, Ohio, just across from Parkersburg, it "dawned on" King for the first time "that Marietta wanted to grow and become a dominant kind of provider of that area." *Id.*, at 37, 40. This was new territory for King, who had worked in executive management at Camden Clark for about ten years. *Id.*, at 10. King had staked out

Belpre as Camden Clark's territory, not MMH's. *Id.*, at 40. And Camden Clark always regarded MMH as "a smaller, kind of less-sophisticated hospital." *Id.*, at 39. Competition between Camden Clark and MMH had always been "affable" on that basis, with Camden Clark content to ignore MMH's activities. *Id*.

That changed when Defendant King began to notice MMH's demonstrated growth, the building of the new Belpre facility, and increased hiring of physicians. After enactment of the Affordable Care Act, "more and more physicians nationwide were being employed." *Id.*, at 42. King understood that in order to compete in that environment, keep up growth, and ensure the financial viability of MMH's new facilities, MMH hired additional physicians in a range of practice areas and specialties. *Id.*, at 42-43, 45. After MMH started hiring physicians, so too did Camden Clark. *Id.*, at 44.

The problem, however, was that the "small and less-sophisticated" MMH was having more success and attracting more physicians than Camden Clark. *Id.,* at 44-45. Not only was MMH "eating into Camden['s] business," Exhibit 24, at 53, and "beating [Camden's] pants in website presentation and content," Exhibit 25, at 1, but MMH was also hiring away some of Camden's doctors. Exhibit 26, at 45. From King and Kruger's standpoint, the "playing field [had become] unfairly unlevel." *See Id.*, at 34–35; *see also* Exhibit 20, at 148–49. King and Kruger purportedly thought that MMH's offers were so excessive that they violated federal law prohibiting self-referrals and kickbacks. Exhibit 26, at 45–47, 76–77. In short, MMH hired some physicians who traditionally referred most of their patients to Camden Clark. *E.g. id*., at 63. But after joining MMH, those physicians largely referred patients to their colleagues within the MMH healthcare system. *Id.* at 63–65. King and Kruger acknowledge that there is nothing inherently wrong with referring in-system — Camden expected its physicians to do just that,

even requiring it by way of their contracts. But Defendants King and Kruger thought that the only way that MMH could best them was through illegality. *See id.*, at 255–57; *see also* Exhibit 20, at 280–82. In fact, as explained below, King and Kruger wanted to take down MMH by any means—going so far as triggering a comprehensive federal investigation based on specious allegations of fraud.

Over time, Defendant King "rais[ed] his eyebrows to" MMH's physician hiring practices. *See* Exhibit 26, at 58. But what supposedly verified to Defendant King that MMH was violating federal law, and that he needed to do something about it, was a phone call he received from Defendant Roberts, a local surgeon, in 2012. *Id.* According to Defendant King, Defendant Roberts called him to "report" an offer from MMH that Defendant Roberts suspected was "illegal." *Id.* at 81-84. That offer, according to Defendant Roberts, included a whomping $500,000 per physician for "part-time" work, paying for each physician's malpractice insurance, and employing their staff. *Id.*, at 84. As discovery has revealed, however, that purported offer substantially changes depending on who is telling the story and when.

Following that phone call, King and Kruger, on behalf of Camden Clark decided to send a letter referring MMH to the United States Attorney for the Southern District of Ohio ("SD Ohio") for criminal investigation. *See* Exhibit 26, at 34–35, 73–74; *see also* Exhibit 2. Far from concrete allegations of illegal activity, however, the letter itself reveals that King and Kruger's suspicions were based on nothing more than speculation and innuendo — not actual knowledge or facts. The duo admitted that they "ha[d] no knowledge of the final terms . . . or of the total compensation being paid" to one physician and "no specific knowledge of the total compensation being paid" to another. Exhibit 2, at 6. Indeed, Defendants King and Kruger scattered such concessions of lack of knowledge throughout the letter. *See id.*, at 7, 9–11. That is,

King and Kruger accused MMH of criminally paying physicians in excess of fair market value, but *they had no idea* what MMH was paying its physicians and whether MMH had obtained fair market value studies supporting those payments. *See* Exhibit 26, at 106–07, 147; *see also* Exhibit 20, at 118–19. And incredibly, during their depositions for this case, King and Kruger made clear not only that they did not know whether MMH had obtained or conducted FMV assessment, but also that they did not care whether MMH did or did not confirm FMV. *See* Exhibit 26, at 145–47, 282–85; *see also* Exhibit 20, at 117–19. Defendants King and Kruger were simply convinced that what MMH was doing was criminal and the existence of facts to the contrary would not dissuade that belief. *See id.*

Moreover, Defendants' letter describes an altogether different offer purportedly made to Defendant Roberts. The letter claims that MMH offered Defendant Roberts and his colleagues (described as "Medical Group JKL") "half of their historical W-2 compensation in return for 'doing some cases at Marietta Memorial,'" as well as malpractice insurance and health insurance for the group's employees. *See* Exhibit 2, at 9. As outlined above, Defendant Roberts' call to Defendant King did not mention anything about W-2 compensation.

What's more, King and Kruger repeatedly conceded that the letter was based upon mere rumor and hearsay. The letter explained that its factual information was "conveyed . . . by third parties," "verbally relayed to [Defendants]," included "anecdotal accounts," and was not all "independently verified." Exhibit 2, at 4 n.1, 6, 7–8, 12. In his deposition, Defendant King explained that he thought MMH violated Stark based on what a physician he knew had supposedly heard from his patients. *See* Exhibit 26, at 215–21; *see also* Exhibit 20, at 278–79. Even having left the substance of their allegations to the imagination, the most King and Kruger could muster is a bald assertion that MMH's compensation practices "arguably stretch or exceed

the limits of reasonableness and fair market value." Exhibit 2, at 2. Unsurprisingly, the United

States Attorney declined to launch an investigation into MMH based on information King and

Kruger freely admitted they did not really know. Camden Clark decided to drop the matter as

well. Exhibit 26, at 79. King and Kruger, however, were undeterred and decided to up the ante.

    **C. Seeing dollar signs, Defendants Kruger and King, seek counsel to begin a private
effort to damage MMH and make millions in the process.**

In early 2015, King, who had since retired, reached back out to Kruger because he "just

couldn't let it go" and wanted to continue their crusade against Marietta Memorial. *Id.*, at 111–

12. However, by that point, it was no longer just about "bringing down [MMH]." Exhibit 20, at

85-86. Instead, Defendants King and Kruger realized that they could strike a blow to their hated

rival and get paid handsomely in the process. Kruger had become aware that relators (i.e., the

plaintiffs) in various False Claims Act settlements against healthcare systems had received a

portion of those settlements — a relator's share — worth millions of dollars. *See* Exhibit 12, at

451-52, 611-615; 31 U.S.C. § 3730(d). The pair decided to pursue a private *qui tam* action under

the False Claims Act and split their potential spoils 50/50. *See* Exhibit 26, at 126–28; Exhibit 12.

To secure counsel, Kruger contacted Philips & Cohen LLP ("P&C"), a national *qui tam*

law firm, in early Summer 2015. Exhibit 20, at 51–52. Defendant Kruger sent P&C a letter

which was substantially the same as the letter Defendants King & Kruger had sent to the SD

Ohio in 2013 and would later send to Bryan Vroon in 2016. *Id.*, at 52-53, 56, 106. P&C

proceeded to conduct an eight-month assessment of Defendant King and Kruger's allegations

and potential claims. *See* Exhibit 9, at 1-14. But after spending months investigating Defendant

King and Kruger's claims, P&C declined to represent them. P&C did so because their allegations

lacked "inside information" about MMH's operation. *See* Exhibit 1; *see also* Exhibit 20, at 54–

55. According to Kruger, P&C declined because "they wanted . . . additional evidence . . . that

[Defendants weren't] able to provide." Exhibit 20, at 54, 55. P&C told Kruger that he and King needed an "insider" — that is, someone, unlike Defendants King and Kruger, who might have actual knowledge about MMH's employment arrangements. *Id.* at 99.

Likely seeing the writing on the wall, Defendants King and Kruger attempted to bring Defendant Roberts into the fray to remedy their "insider" problem. Defendant King contacted Defendant Roberts, an area surgeon who was not employed by MMH and thus was not an actual insider. *See* Exhibit 26, at 142–44; *see also* Exhibit 20, at 100, 104–05. But as outlined above, Dr. Roberts claimed to have received an employment offer from MMH that the group considered suspect (an offer MMH disputes). And it is undisputed that no deal between Dr. Roberts and MMH was ever reached. Exhibit 19, at 38-39, 53, 58-59. For Dr. Roberts' direct assistance, King offered to bring Dr. Roberts on as an "equal partner" in the *qui tam* suit, and Dr. Roberts agreed. Exhibit 26, at 144-45. But, despite the involvement of Defendant Roberts, P&C still declined. Exhibit 20, at 101, 104. Defendant Kruger himself acknowledged that Defendants "missed the mark" concerning P&C. *Id.* at 105.

Despite P&C's declination, Defendants King and Kruger did not end their journey to "bring down [MMH]." *Id.*, at 85-86. Instead, they continued to press on, looking for someone who would help them accomplish their goal. *See* Exhibit 1. P&C informed Defendants King and Kruger that "other [lawyers] may be a bit more hungry to work up a case like this and take the risk," *id.*, or "may view the matter differently." *See* Exhibit 1; *see also* Exhibit 18, at 1. Among a few other lawyers, P&C recommended that Defendants King and Kruger contact Bryan A. Vroon. Exhibit 26, at 140. Shortly before Defendants received that referral, Mr. Vroon had settled another *qui tam* action alleging violations of Stark and AKS for $69 million, of which his client received over $10 million. Exhibit 21, at 61-62.

On March 21, 2016, the trio sent Vroon a letter soliciting his legal representation for a *qui tam* action against MMH. *See* Exhibit 6. The letter to Vroon bears a striking resemblance to the 2013 letter sent to the SD Ohio, but with some key and telling differences, raising doubts about Defendants' later rendition — a rendition that would largely track the allegations in their eventual *qui tam* complaint. *Compare* Exhibit 6, *with* Exhibit 2.

For one thing, in Defendants King and Kruger's 2016 letter to Vroon, MMH's compensation practice was no longer "arguably stretch[ed] or exceed[ed]" legal limits, and MMH no longer "potentially violate[d] numerous federal laws and regulations." Exhibit 2, at 2-3. Instead, armed with no new insight into MMH's compensation practices, the trio sold Vroon on the firm conviction that MMH "clearly exceed[ed] the limits of reasonableness and fair market value" in violation of federal law and that MMH "do[es] not rely on fair market value assessment or experts at all." Exhibit 6, at 1; Exhibit 26, at 147.

For another thing, the trio misled Vroon as to why P&C declined to take on their *qui tam* case. P&C did so because the case was too risky and lacked insider information or a true insider with personal knowledge who could do more than speculate on MMH's purported physician compensation in excess of fair market value. But Defendants sold Vroon on the idea that P&C — national experts on *qui tam* practice — declined the case simply because the firm was too busy. *See* Exhibit 6, at 15; Exhibit 21, at 61 (reasoning that "there was a change of direction within the firm based primarily . . . on current case load and priorities within the firm"). In any event, Vroon bought the trio's assertions and took the case. Exhibit 21, at 28-29, 58-60.

After engaging Vroon, Defendants' focus on their potential financial incentive only grew. Prior to filing the *qui tam* complaint, Vroon engaged an analyst to assess MMH's financial ability to pay a possible settlement. That analyst informed Vroon, and in turn Defendants, that

MMH had received "over $300 million" from Medicare over the preceding five year period and that MMH had "over $40 million of cash in banks," as well as "other current assets that could cover a *large settlement*." Exhibit 60, at 1 (emphasis added). And around that time, Defendant Kruger was discussing with Vroon an arrangement that would allow Defendant Kruger to receive a substantial part of any recovery. *See* Exhibit 62, at 1-3. Because, according to Defendant Kruger, he had "put this case together and ha[d] done 90% of the work," he sought to think "way out of the box" so that he could receive a big payday, even if it meant taking from Defendants King's and Roberts' relator shares. *See id.* At the end of the day, Defendants expected that their initiation and pursuit of the *quit tam* could gain them a substantial part of an "8 figure number." Exhibit 61, at 1.

### D.  Defendants initiate Underlying Action based on false, misstated, and unsupported allegations and intentionally trigger extensive federal investigation.

On November 22, 2016, Defendants filed their Underlying Complaint with this Court. *See* Exhibit 10. Consistent with the agreement amongst Defendants and Vroon, only Defendants King and Roberts were identified as named relators in that complaint. In general, the Underlying Complaint sought recovery under the FCA and alleged that MMH had violated the Stark law and AKS. In general, the Stark law and AKS prohibit hospitals from paying a physician outside of fair market value for referrals to that hospital. *See generally* 42 U.S.C. § 1395nn (Stark); 42 U.S.C. 1320a-7b (AKS). By way of their Underlying Complaint, Defendants alleged that MMH offered or paid more than 15 physicians for referrals and that "far exceeded the fair market value." *See* Exhibit 10, at ¶¶ 186-88.

But as the discovery in this case shows, those allegations were false. Below are practices and physicians that Defendants falsely alleged MMH paid or offered "kickbacks" and amounts "far in excess of the [fair market] value," *see id.*, at ¶¶ 37-38,186:

- Defendants alleged that in the Summer of 2012 or 2013, Mr. Cantley verbally offered each of the three PSA physicians — Defendant Roberts, Dr. Kaplan, and Dr. Koch — "$500,000" each for "part-time" work "based on [their] tax information," for which those doctors could keep their professional fees. *See id.*, at ¶¶ 49-74. But as Mr. Cantley testified, *that offer "never occurred*." Exhibit 11, at 39. In fact, Mr. Cantley explained that there would have no way to actually make good on that offer. Not only did he not make offers in that manner prior to obtaining an FMV assessment, but he would have been "fired . . . for doing something as stupid as that." *Id.* at 39. And the documentary record supports that Defendants' allegations were false. There is *no documentary record* of any exchange of tax information. Defendant Roberts himself couldn't even recall ever providing such information. Exhibit 19, at 143.

- The Underlying Complaint alleged that MMH paid physicians with First Settlement Orthopedics ("FSO") "$72,000 per year for . . . 'medical director services'" for a total of "$360,000 annually" for those services, and that FSO's practice manager communicated to Camden's then-CEO that MMH's offer to purchase FSO and employ its physicians was "so 'unbelievable' that the FSO surgeons questioned whether it was legal." Exhibit 10, at ¶¶ 75-82. But that $72,000 per year for medical director services was "*patently false*." Exhibit 15, at 155. A FSO physician that served as a medical director received "$250.00 an hour for up to 10 to 20 hours per month [for that work]. Nowhere close to $360,000."*Id.* And that FSO practice manager later clarified that he had no idea about communicating any such sentiment to Camden's CEO. *See* Exhibit 23, at 1. Moreover, the FSO practice manager explained that around 2017, FSO physicians ended up obtaining medical directorships from *Camden*. *Id.*

- In the Underlying Complaint, Defendants stated that MMH's $2.2 million purchase of a pain management clinic from PARS Neurological Associates, Inc. in 2014 was "far beyond any fair market valuation" and that MMH made "excessive payments" to PARS. Exhibit 10, at ¶¶83-96. But that *was false*. MMH had obtained a third-party FMV opinion for that purchase at the time that concluded that $2.2 million was consistent with FMV. *See* Exhibit 15, at 45-49, 110-11; Exhibit 27, at 3; Defendant Kruger "had no idea" that MMH had a FMV opinion done for the PARS pain

management clinic acquisition, and that it frankly did not "matter[] to [him]." *See* Exhibit 20, at 114-118. And Defendant King did not know that MMH had obtained such an FMV opinion either and had no "reason to critique" that opinion. *See* Exhibit 26, at 157-160.

- Defendants alleged that MMH compensated Dr. Srini Vasan — a radiation oncologist — in excess of FMV for his physician services and his company's physics services, which calibrated MMH's radiation equipment. *See* Exhibit 10, at ¶¶ 97-111. The Underlying Complaint claimed that MMH's "excessive payments to [Dr.] Vasan are not based on the value of Dr. Vasan's personals services or collections from his personal services [and that t]he only economic basis for compensation . . . is revenues from referrals. *Id.* at ¶ 111. Again, ***false allegations***. Over the years, MMH had obtained numerous FMV assessments, studies, and opinions concerning all aspects of Dr. Vasan's compensation, including his company's calibration services. *See generally* Exhibit 31; *see e.g., id.* at 4, 30, 55, 59, 88, 93, 111, 129, 135-36. Defendant King acknowledged that Defendants did not know about those FMV opinions. *See* Exhibit 26, at 274-76. The Underlying Complaint also stated that MMH did not pay Dr. Vasan based on wRVUs. *See* Exhibit 10, at ¶¶104-105. But that too ***is materially untrue***. As established by way of his employment agreements, Dr. Vasan's compensation was based or adjusted based on wRVUs. *See* Exhibit 28, at 3; Exhibit 29, at 1; Exhibit 30, at 4-5; Exhibit 31, at 62.

- Defendants alleged that MMH paid Dr. Curtis White, an OB-GYN and gynecologic oncologist, and Dr. Stephen Stanley, another OB-GYN, so excessively that such payments "can only be justified based on the value of referrals." Exhibit 10, at ¶¶ 112-120. Those allegations are devoid of support and ***are false***. In reality, Dr. White and Dr. Stanley were paid based on the *median* per wRVU. *See* Exhibit 32, at 4; Exhibit 33, at 1; Exhibit 35, at 1; Exhibit 36, at 1.

- Likewise, Defendants' Underlying Complaint stated that MMH excessively paid surgeons Dr. Matthew Yoak and Dr. Rajendra Bhati. *See* Exhibit 10, at ¶¶ 121-27. It alleged that those physicians were paid "in excessive of the national 90th percentile," at a rate "multiple times the compensation rates for other general surgeons," and that the "only economic basis to pay [Dr.] Bhati such extraordinary income was the value

of referrals." *Id.* at ¶¶ 122, 126-27. Again, those ***are false***. Dr. Yoak was paid at 75th percentile per wRVU, call overage consistent with FMV, and MMH obtained a FMV report for his employment. *See* Exhibit 37, at 4; Exhibit 38, at 1; *see generally* Exhibit 39. And MMH also paid Dr. Bhati at the 75th percentile per wRVU, consistent with fair market value. *See* Exhibit 40, at 4; Exhibit 41, at 1; *see generally* Exhibit 42. In fact, in 2012, Camden had offered to pay Dr. Bhati *more than MMH*. *See* Exhibit 7, at 22-23.

- The Underlying Complaint alleged that MMH's employment of family medicine physician Dr. Gary Tucker, as well as its purchase of family medicine practice and his office building, were "'far above appraised value'" and not consistent with "fair market value." Exhibit 10, at ¶¶ 128-135. Defendant's allegations about Dr. Tucker ***are false***. MMH paid Dr. Tucker based on the median wRVU. *See* Exhibit 43, at 4; *see generally* Exhibit 44. And MMH purchased Dr. Tucker's assets and building at the amount provided in the FMV opinion of his assets and appraisal of his building. *See* Exhibit 45, at 1-2; Exhibit 46, at 2; Exhibit 47, at 5. Defendant King did not know that MMH had obtained FMV assessments, including an appraisal for Dr. Tucker's building. Exhibit 26 at 282-285. Even Defendants' lawyer, Mr. Vroon, acknowledged that Dr. Tucker "'may have been fluffing . . . to get more cash for his property and play Camden . . . against [MMH].'" Exhibit 20, at 206-08.

- Defendants also include a litany of allegations about Dr. Leah Hopkins, a family practice physician. *See* Exhibit 10, at ¶¶ 137-54. But like the others, Defendants' allegations about Dr. Hopkins ***are false***. Among other allegations, Defendants stated that Dr. Hopkins was paid excessively "with the objective of controlling and rewarding her for . . . referrals" and that "Hopkins ha[d] confirmed that she [was] not permitted for any reason to make any referrals outside of [MMH's] system." *Id.* at ¶¶153-54. They made those allegations without ever speaking with Dr. Hopkins or seeking to confirm those allegations. *See* Exhibit 26, at 218-19. Contrary to the allegations, MMH paid her at the *median* rate per wRVU. *See* Exhibit 48, at 4. MMH purchased the assets of Dr. Hopkins' practice at FMV. *See* Exhibit 49, at 1, 6. More pointedly, Dr. Hopkins herself testified that MMH never pressured or required her to refer patients within the system, and she never told patients that she could only refer

within the MMH system. *See* Exhibit 50, at 14-16. Indeed, Dr. Hopkins explained she actually made referrals to the Camden-affiliated practice that the Underlying Complaint claimed she could not. *See id.* at 18.

- The Underlying Complaint includes allegations about a number of physicians who were part of Cornerstone Health Care, Inc., a group of family practice physicians. *See* Exhibit 10, at ¶¶ 156-178. That is, Defendants alleged that MMH paid Dr. Katrina Barnes, Dr. Steven Richards, Dr. Chris Edmunds, and Dr. Gabriel Maijub "compensation far higher than prevailing market rates and far higher than the value of the physicians' personal services or productivity." *Id.*, at ¶ 177. In reality, however, MMH did no such thing. Dr. Barnes had a $175,000 base salary and was paid based on *median* per wRVUs, and her total was under the median total salary. *See* Exhibit 51, at 4; Exhibit 4, at 1-2. Likewise, Dr. Richards, Dr. Edmunds, and Dr. Maijub were paid compensation based on the *median* per wRVU. *See* Exhibit 34, at 4-5; Exhibit 54, at 4; Exhibit 55, at 4. MMH had also obtained a FMV opinion for the Cornerstone physicians — including Dr. William Cartwright — and set their compensation and offers consistent with that opinion. *See* Exhibit 56, at 4.

Although Defendants claimed to have conducted an investigation for those allegations, it was not one with any serious effort to discover the truth. Defendants did not speak to the physicians, such as Dr. Hopkins, who they claimed were paid excessively or induced to make referrals. *See* Exhibit 50, at 17-18; Exhibit 20, at 277-79; Exhibit 26, at 218-220. Defendants did not have access to FMV assessments. *See* Exhibit 21, at 67-69. And Defendants relied only on the documents they possessed — including predominantly those submitted to the DOJ with Defendant King and Roberts' disclosures — to "verify[] the accuracy of the [allegations]." *Id.,* at 69-71. As outlined above, however, the problem is that even those documents contained unsupported hearsay, material misstatements, and untruths.

Despite the falsity of their allegations, Defendants' Underlying Complaint achieved their goal of triggering a federal investigation and damaging MMH. *See* Exhibit 59, at 2-4. The DOJ

investigated for roughly three years, "interviewed dozens of witnesses" and "obtained over 1 million documents." Exhibit 8. Indeed, Defendant Kruger excitedly shared with Mr. Vroon that the DOJ investigators "left quite an impact on the community after their first three days of investigation," such that word had made it "all the way to Morgantown." Exhibit 58, at 6893. As Defendant Kruger explained, the investigation had "becom[e] big news" in the Mid-Ohio Valley. *Id.* Furthermore, as Defendant Kruger shared with one member of the medical community, they, at Camden Clark, would "capitalize on this [DOJ investigation] situation." Exhibit 20, at 266. Although harmful and intentionally triggered by falsity, the federal investigation was not the only avenue by which Defendants sought to "bring down [MMH]." Exhibit 20, at 85-86.

**E.  As part of their plan, Defendants propagate false allegations about MMH and MMH suffers substantial harm.**

Not leaving their effort to harm MMH to chance, Defendants proceeded to spread word of their *qui tam* action and the false allegations underpinning it before and after the investigation began. One of Defendant Roberts' PSA partners, Dr. Adam Kaplan, explained that Defendant Roberts had spoken with him about the *qui tam* and the allegations at the time it was ongoing, and that "every nurse in [Camden]" knew what he was told by Defendant Roberts. *See* Exhibit 22, at 72-75, 79-81. Defendant King had discussed the prospect of the *qui tam* and the allegations with Camden's then-CEO, David McClure. *See* Exhibit 26, at 27-29. And Defendant Kruger exchanged numerous emails over multiple years with members of the Mid-Ohio Valley medical community, spreading baseless speculation and the false *qui tam* allegations, and predicting that MMH and its officers would be punished (even criminally). *See* Exhibit 3, at 391. He did so all while expressing his deep "hate" for MMH. *Id.*, at 463, 857.

Worse yet, Defendants spread all of that information throughout the Mid-Ohio Valley even though Mr. Vroon had instructed them that "it [wa]s imperative and mandatory under

16

federal law . . . to maintain strict confidentiality," that the "potential sanctions for violating the federal seal . . . are severe," and "to never discuss this case" or "any substantive issues related to the [Underlying Action] with anyone." *See* Exhibit 59, at 173.

### F.  The DOJ confirms to Defendants that their allegations were unsupported, and the Underlying Action against MMH is dismissed.

Two years into its investigation, the DOJ made a presentation to MMH in May 2019. The DOJ explained the allegations of the *qui tam*, the steps it had taken during the investigation, and points on which it needed further clarity. *See generally* Exhibit 5; *see also* Exhibit 14, at 43-44, 67-68, 81-83. Interestingly, although that presentation largely mirrored the allegations of the Underlying Complaint, it only mentioned Defendant Roberts or PSA once. *See id.* at 12. That is, even though the Underlying Complaint focused extensively on the outlandish supposed offer made by MMH to Defendant Roberts and the PSA, the DOJ had no questions about it, reflecting its facial absurdity. Likewise, the DOJ never questioned Mr. Cantley, MMH's CEO who allegedly made that offer, about the claimed meeting or offer. *See* Exhibit 11, at 115.

And, despite Defendants' penchant for referring to that DOJ presentation as a "settlement presentation," the presentation was no such thing. *See* ECF No. 329, at 7; *see also* Exhibit 14, at 43-44, 81-83. Indeed, the DOJ never even discussed "[p]ossibly settling" or "ask[ed] for compensation." Exhibit 11, at 241-42. The DOJ simply marked their presentation as being for settlement purposes to make it "subject to [Federal Rule of Evidence] 408." Exhibit 5, at 1.

Two months later, MMH made a clarifying counter-presentation. In that presentation, MMH had shed further light in response to the DOJ's questions and desire for clarification. *See* Exhibit 14, at 67-69, 82-83, 137-38, 190-92; *see also generally* Exhibit 7. That presentation walked through MMH's growth strategy, its permissible approach to referrals, its FMV analyses,

and the specific compensation of physicians. *See generally* Exhibit 5. And that presentation apparently answered any lingering questions federal investigators might have had.

Months later, after not seeking any additional information from MMH, the DOJ informed Defendants that the Government had decided not to intervene because there was not "enough evidence of Stark law or AKS violations." Exhibit 8. Following years of digging investigation, the DOJ simply did not "find sufficient evidence of FMV overpayments or contracts terms that violate Stark laws or the AKS." *Id.* That is, the investigation revealed what MMH always knew: Defendants' allegations lacked support and were false.

## PROCEDURAL BACKGROUND

Defendants' Joint Motion for Summary Judgment is their latest of *four* previous attempts to escape culpability for filing a fallacious *qui tam*. Prior to being transferred from the District Court for the Southern District of West Virginia, Defendants filed their first Joint Motion to Dismiss ("Original Motion") (ECF No. 13). In that motion, Defendants sought a venue transfer to this District based on convenience and advanced identical arguments to those addressed here. *Compare id.,* at 1 *with* ECF No. 329. Ultimately, the Southern District transferred this action without passing on any of Defendants' dismissal arguments. *See* ECF No. 24.

Defendants' second swing at dismissal came by way of a renewed motion — also titled Defendants' Joint Motion to Dismiss (ECF No. 30) (the "Second Motion) wherein Defendants reiterated the dismissal arguments from their Original Motion briefing, largely verbatim. Defendants again incorrectly contended that Plaintiffs' claims were preempted by the FCA and that the malicious prosecution and abuse of process claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6). While that motion was pending, Defendants sought to impede the progress of this action by pausing discovery for several weeks, without cause. *See* ECF No.

18

38, at 1-6; ECF No. 34, and ECF No. 39. Unfortunately for Defendants, those delay tactics were correctly rebuffed by this Court, as were a majority of Defendants' contentions within the Second Motion.[2] By way of its Order rejecting Defendants' Second Motion, this Court provided an extended review of the decisions repudiating Defendants' preemption argument and recognizing the presumption against preemption. *See* ECF No, 40, at 3-10 (finding that Defendants failed to "cite to any case in which a court found that the FCA in fact preempted state remedies for improper conduct — presumably because there are none"). Unhappy with this Court's decision, Defendants took the unprecedented step of requesting that this Court "reconsider" and "reverse" its rulings. *See* ECF No. 48, at 8, 10, 15, 21. Defendants did so based on the same arguments that they had briefed—and lost—twice. Defendants' attempt at reconsideration failed.

In another effort to relitigate these issues, Defendants requested relief under both Rule 12(b)(6) and Rule 56 by way of their third Joint Motion. In again denying Defendants' attempt at dismissal, this Court recognized that Plaintiffs had successfully stated a claim for malicious prosecution, tortious interference, abuse of process, and fraudulent legal process under both the Rule 12(b)(6) and Rule 56 standards. *See* ECF No. 134.

Despite his co-defendants' three prior attempts at dismissal, Defendant Kruger filed his own Motion to Dismiss (the "Fourth Motion"). *See* ECF No. 140. By way of that Motion, Defendant Kruger reiterated many of the same arguments with respect to the litigation privilege and preemption and Plaintiffs' claims for malicious prosecution, abuse of process, tortious

---

[2] The Opinion did not reject Defendants' contention that Plaintiffs' tortious interference claim failed, and accordingly dismissed the claim. The claim was later reinstated following the identification of Defendant Kruger and the role he played in initiating the Underlying Action.

interference, conspiracy, and fraudulent legal process. Defendant Kruger's only new argument — that the *Noerr-Pennington* doctrine precluded Plaintiffs' claims — was similarly unpersuasive. Like his co-defendants, Defendant Kruger took a swing at dismissal — and missed. As Defendants' current Motion presents many of the same arguments as their four prior attempts, this Court should reject those arguments here as it has before. Furthermore, rejection is even more justified here as the facts exposed in discovery verify the allegations outlined in Plaintiffs' Amended Complaint: Defendants initiated and pursued the Underlying Action based on false and materially misstated allegations and spread those allegations throughout the Mid-Ohio Valley, as part of a malicious effort to damage MMH.

## ARGUMENT

**1. As this Court has ruled time and time again, the litigation privilege does not bar any of Plaintiffs' claims.**

Defendants attempt to apply the litigation privilege as a bar to Plaintiffs' claims, asking this Court to reconsider retired arguments and ignore what is undisputable: Defendants made a concerted effort to harm Plaintiffs when they initiated and pursued the Underlying Action. By way of their Motion, Defendants seek summary judgment on Plaintiffs' claims for tortious interference, abuse of process, and fraudulent legal process based on the litigation privilege "regardless of whether all three defendants were in concerted efforts against Plaintiffs." ECF No. 329, at 25. In doing so, Defendants do not cite any new support—legal or otherwise—for their contention, which this Court has already considered and rejected *four times*.

At no point in Defendants' Motion do they cite any updated law which would require or even suggest that this Court change its mind about the applicability of the litigation privilege. *See generally,* ECF No. 329. Moreover, Defendants do not challenge a critical factor that is not in dispute with regards to the litigation privilege — that Defendants, including Defendant Kruger

who was not a named party to the Underlying Action, worked in concert to pursue the Underlying Action. And the Court's previous ruling on the matter was simple: the litigation privilege ***does not apply*** if it is found that all three Defendants were in concerted efforts against Plaintiffs. *See* ECF No. 134. (emphasis added).

The record unambiguously demonstrates that all three Defendants conspired together to plan, initiate, and pursue the underlying action *against* Plaintiffs. *See* Exhibit 6; ECF No. 107; Exhibit 52. Defendants knowingly and intentionally brought the underlying action with a single goal in mind: to initiate government action that would certainly impede Plaintiffs' business in the Mid-Ohio Valley. *See* Exhibit 3, at 476, 686.

Defendants' argument that the litigation privilege would be "meaningless if a plaintiff could defeat its protections by simply claiming that the defendant acted in concert with a non-party to the subject litigation" is likewise unpersuasive. *See* ECF No. 329, at 26. In support of that contention, Defendants offer nothing but a single sentence: "the contributions of a non-party to conduct otherwise protected by the litigation privilege *should not* defeat the privilege as to the litigation party." *See id*. Defendants' position asks this Court to ignore Defendant Kruger's critical role in procuring the underlying action — which he himself describes as "really my deal… I put this case together and have done 90 percent of the work." *See* Exhibit 20, at 33; Exhibit 62, at 6337.

Defendant Kruger's actions — though certainly enough to subject him to liability for his malicious conduct — do not render him or the other Defendants shielded by the litigation privilege. *See Clark v. Druckman*, 624 S.E.2d 864, 870 (W. Va. 2005) (explaining that the litigation privilege applies to what occurs "during the litigation process"); *see also Dunn v. Rockwell*, 689 S.E.2d 255, 269 (W. Va. 2009) (explaining that defendants who "shared a

common plan" for commission of a wrongful act or tort can be held liable). Because of

Defendant Kruger's role as a non-party co-conspirator, his counterparts — Defendants King and

Roberts — likewise cannot hide from liability behind the litigation privilege. This Court rejected

Defendants' prior arguments regarding the litigation privilege and should do so again. *See* ECF

No. 40, ECF No. 134.

> **2. Defendants are not entitled to summary judgment on Plaintiffs' claim for malicious prosecution, despite advancing another attempt to relitigate settled issues.**

To successfully state a claim for malicious prosecution, a Plaintiff must demonstrate that

"'(1) that the prosecution was malicious, (2) that it was without reasonable or probable cause,

and (3) that it terminated favorably to plaintiff.'" *See* Syl. Pt. 1, *Norfolk S. Ry. Co. v.*

*Higginbotham*, 721 S.E.2d 541 (W. Va. 2011). Plaintiffs have done just that.

> **A. Defendants procured the prosecution of the Underlying Action.**

Defendants — again — mistakenly contend that Plaintiffs have failed to demonstrate that

Defendants procured the prosecution of the Underlying Action. *See* ECF No. 329, at 30. Under

West Virginia law, the meaning of procurement is that the "defendants consulted and advised

together, and both participated in the prosecution, which was carried on under their countenance

and approval." *See Vinal v. Core*, 18 W. Va. 1, 2 (1881). West Virginia courts recognize that

procurement is satisfied where an individual provides knowingly false information to cause an

action to occur. *See Norfolk*, 721 S.E.2d at 547.

The record unambiguously demonstrates that Defendants provided false or materially

misstated information in the initiation and ultimate filing of the Underlying Complaint, as well as

in dealing with investigators. Defendants not only knew this information was false — they

sought to hide that falsity from Mr. Vroon, to ensure his participation in the Underlying Action.

*See* Exhibit 6. Defendants also refused to conduct any legitimate or reasonable investigation that

would undermine their allegations, theories, and efforts to harm MMH. *See* Exhibit 50, at 17-18; Exhibit 20,  at 277-79; Exhibit 26, at 218-220. As this Court has already determined, the procurement element is satisfied by way of Defendants' concerted efforts to carry out the Underlying Action, which the record bears out. *See* ECF No 134; *see* ECF No. 183.

Additionally, there can be no question that Defendants had control over the prosecution of the Underlying Action by the very nature of the claims they made against Plaintiffs. While the Government chose not to prosecute the claims against Plaintiffs based on their investigation, Defendants continued to attempt to convince the Government to intervene and move forward with a *qui tam* lawsuit even after knowing the Government had decided otherwise. *See* Exhibit 59; Exhibit 57; Exhibit 3, at 476, 686. And Defendants retained the discretion to pursue the Underlying Action throughout the years-long investigation, and beyond. *Id*. In fact, the record reflects that counsel for Defendant King took affirmative steps to procure additional action from the Department of Justice *after* the government declined to intervene in the Underlying Action. *See* ECF No. 322; *see also* Exhibit 59; Exhibit 57. Defendants initiated, directed, and controlled the underlying action by way of their *qui tam* complaint, their participation in the government's investigation, and the affirmative steps taken after the government's dismissal to prolong Plaintiffs' harm. The procurement element is satisfied.

**B.  As this Court has ruled countless times, the qui tam action terminated in Plaintiffs' favor.**

Defendants maintain that the dismissal of the underlying action does not satisfy the "favorable termination" element necessary for a claim of malicious prosecution. In support of that erroneous contention, Defendants again rely on *Goodwin v. City of Shepherdstown*, despite this Court's explicit rejection of that argument more than three times. *See* ECF No. 40, ECF No. 234, ECF No 183.  Yet again, Defendants suggest that because the District Court dismissed the

Underlying Action against Plaintiffs "without prejudice," Plaintiffs have failed to establish that the favorable termination element is met. *See* ECF No. 329, at 29-20. This argument again baldly ignores West Virginia Supreme Court precedent that *expressly* defined the termination (or "discharge") necessary for a malicious prosecution claim in this State:  it does "not [require] that the plaintiff had been so discharged, as that no subsequent prosecution for the same alleged [conduct] could ever be instituted, but [it requires] only that this particular prosecution was ended." *See* Syl. Pt. 3, *Vinal*, 18 W. Va. 1 (1881).

This Court has already examined this argument on four separate occasions, rejected it, and properly determined, as a matter of law and based on the well-pled facts, that the Underlying Action was terminated in Plaintiffs' favor. *See* ECF No. 40, at 11-12; ECF No. 51, at 3; ECF No. 134, at 6-8. This Court concluded that "defendants maliciously initiated and continued a qui tam action against plaintiffs that was based on knowing falsities and *that was ultimately terminated in plaintiffs' favor by a district court*." *See id.; see also* ECF No. 134 (emphasis added). As this Court outlined: "The dismissal ended the action…[w]hile the notation of without prejudice means that a new case could be filed, this case has ended." *See* ECF No. 134. at 7. Nothing in discovery has—or could—change the fact that the Underlying Action has ended and that Defendants' malicious Underlying Action was dismissed.[3]

Moreover, Defendants attempt to alter the standard required to demonstrate a malicious prosecution by indicating that the dismissal of the Underlying Action "does not suggest or reflect the innocence of the Plaintiffs here." *See* ECF No. 329, at 30. But to prove malicious

---

[3] As outlined above, communications disclosed in discovery indicate that the government declined to intervene in the underlying action due to a lack of evidence and inability to substantiate Defendants' claims. *See* Exhibit 8. Certainly, such communication is further proof that the underlying action terminated *in Plaintiffs' favor.*

prosecution, Plaintiffs must simply demonstrate that the underlying action *terminated in their favor*—Plaintiffs do not have to prove that the underlying action terminated in a way as to prove Plaintiffs' innocence. *See* Syl. pt. 1, *Norfolk S. Ry. Co. v. Higginbotham*, 721 S.E.2d 541 (W. Va. 2011). Such a standard would render any prosecution other than one resulting in an absolute, with prejudice acquittal, not subject to a claim for malicious prosecution. Defendants again ask this Court to apply a standard that would render malicious prosecution utterly meaningless. Simply put, Defendants' position would mean that: "any time an action is dismissed without prejudice and not re-filed, there could **never** be an action for malicious prosecution." *See* ECF No. 134, at 12 (emphasis original).

The termination of the Underlying Action and the circumstances surrounding it have not changed, and Defendants' continued reliance on *Goodwin* remains misguided for the reasons outlined by this Court. *See id*. The Underlying Action was terminated in Plaintiffs favor when the Court dismissed that action based on the request of Defendants King and Roberts.

### C.  Defendants did not have probable cause to support the underlying *qui tam*.

This Court has already correctly determined (multiple times) that Defendants lacked probable cause in initiating and pursuing the Underlying Action. *See* ECF No. 40, at 11-14; ECF No. 51, at 3; ECF No. 134, at 6-8. Now, in support of their fourth attempt to relitigate this issue, Defendants rely on disputed facts and blatant falsities. Defendants point out the fatal flaw of their own argument by citing *Radochio v Katzen*, 114 S.E. 746 (W. Va. 1922). "Probable cause for instituting a prosecution is such a state of facts and circumstances known to the prosecutor personally or by information from others as would, in the judgment of the court, lead a man of ordinary caution, acting conscientiously, in the light of such facts and circumstances, to believe that the person charged is guilty." *Id*.

Not only did Defendants not verify, investigate, or otherwise test the veracity of their own allegations, they intentionally included information in the Underlying Action that was knowingly false. For example, Defendants — and their attorney — solely relied on the word, through multiple levels of hearsay, of third parties to support their allegations. *See* Exhibit 2; Exhibit 6; Exhibit 26, at 106-107; Exhibit 20, at 118-119. By their own admissions, Defendants did not verify *any* item of information, failed to investigate *any* of the actions Plaintiffs allegedly committed, and did not exhaust *any* source of information before instigating the underlying prosecution. *See id.* Defendants certainly did not act with "such caution and diligence as a reasonably prudent man would have to ascertain the truth." *Radochio*, 114 S.E. at 746. Instead, Defendants relied on rumors and material falsities, and often times intentionally ignored conflicting evidence at their disposal or information they could have obtained, but chose not to, like the FMV reports that dispute Defendants' contention that Plaintiffs overpaid any physicians. *See* Exhibit 20, at 117-119; Exhibit 26, at 282-285.

Most alarmingly, Defendants contend that the "government's investigation confirms the existence of probable cause." *See* ECF No. 329. If that were the case, the government would never have to verify the truth of the allegations or tips it receives before pursuing alleged wrongdoers. Moreover, the government would be able — in Defendants' perfect world — to rely on false and materially misstated information to *prosecute* alleged perpetrators. That is certainly not the probable cause standard. *C.f. Brinegar v. U.S.,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 ("To allow less [than probable cause], would leave law abiding citizens at the mercy of an officers' whim or caprice."). If the Court were to adopt Defendants' interpretation of probable cause, it would be forced to overlook the countless disputes of material fact, Defendants' own

failure to investigate their own claims, and that discovery has shown the falsity of Defendants' allegations. *See* Exhibit 8.

**D. Defendants most certainly acted with malice when they initiated a fallacious qui tam unsupported by evidence to harm their biggest competitor.**

"In civil malicious prosecution cases, the issues of malice and probable cause become questions of law for the court *where there is no conflict of evidence or where there is only one inference to be drawn by reasonable minds*." *Baldau v. Jonkers*, 229 W. Va. 1, 10 725 S.E.2d 170, 179 (2011). In support of their dismissal attempt, Defendants rely again on facts which they contend are "undisputed." *See* ECF No. 329. Such characterization fails to consider both the evidence, and Defendants own words when describing the *qui tam* they initiated.

For example, Defendants continuously focus on the alleged offer of employment made by Scott Cantley to the PSA physicians and contend that such offer is evidence demonstrating that Defendants' lacked malice when pushing a fallacious qui tam. *See id.* Next, Defendants point out that Mr. Cantley *denies* making the employment offer at issue and attempt to cover their tracks by indicating that such "self-serving denial" is insufficient to create a question of material fact. *See id.,* at 33. Whether or not Mr. Cantley made an offer of employment to Defendant Roberts and the PSA physicians is most certainly a dispute of material fact. Plaintiffs deny that Mr. Cantley ever made such an offer, and Defendants disagree. Plus, the record evidence supports Mr. Cantley's position—there was no tax information exchanged to consummate Mr. Cantley's purported offer, the PSA physicians have offered different, and oftentimes conflicting, testimony about when the offer occurred, and no employment agreement was ever drafted. *See Harris v. Home Sales Co.*, 499 F.App'x 285, 294 (4th Cir. 2012) (courts do not make credibility determinations at summary judgment stage where a party's corroborated testimony creates a dispute of material fact).

Furthermore, Defendants allege that "undisputed material facts demonstrate that Marietta Memorial overpaid physicians." *See* ECF No. 329, at 33. Again, another critical dispute of fact in this case, as detailed above. Defendants go on to state that Plaintiffs have altogether failed to provide any evidence of an improper motive for the Underlying Complaint and point to Defendants' testimony on that issue. *See* ECF No. 329, at 33. In one breath, Defendants ask this Court to ignore the "self-serving testimony" of Scott Cantley—which clearly establishes a dispute of material fact about the PSA offer—and in another, ask this Court to trust the self-serving testimony of Defendants. In doing so, Defendants also ignore the countless examples of ulterior motives that were illuminated in discovery. Not only did Defendants King and Kruger work for Plaintiffs' biggest competitor when the *qui tam* was initially planned, the original letter to the Southern District of Ohio was sent on Camden's letterhead and signed by its representatives, including Defendants Kruger and King. *See* Exhibit 26, at 34-35; *see also* Exhibit 3, at 450 ("if we are fortunate enough to get the playing field level, things will change").

Worse yet, Defendants' position ignores the countless emails between Defendant Kruger and John Vickers in which the two discuss the benefits of bringing down Marietta Memorial. *See* Exhibit 3, at 857 (Kruger to John Vickers: "I hate those crooked fuckers."). And, the communications in which the pair discuss "bringing down [MMH]," aka "the evil empire." *See* Exhibit 20, at 85-86; *see also* Exhibit 3, at 463. Hate certainly satisfies the malice requirement. *See e.g., Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018) (internal citation omitted) ("To establish malice, a plaintiff must show [that a party] 'intentionally performed an act without legal justification or excise, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff'"); *Brady v. Stiltner*, 21 S.E. 729, 733 (W. Va. 1895) (equating malice with "some other private end or sinister motive of personal hate or

personal gain"); *Estep v. Brewer*, 453 S.E.2d 345, 348 n. 3 (W. Va. 1994) (acknowledging trial court actual malice instruction that included "A person acts with 'actual malice' when he is motivated by a sense of hate, ill will or revenge against the party… in hopes of doing injury to the person or reputation of the subject."). Relying on Defendant Kruger's own words, malice is certainly established. Because Defendants clearly acted with malice when initiating the Underlying Action, summary judgment is inappropriate to determine a dispute of material fact.

**E. The defense of advice of counsel does not preclude Plaintiffs' claim for malicious prosecution where that defense was unreasonable based on Defendants' actions and omissions.**

Defendants next contend that Plaintiffs' malicious prosecution claim is precluded based on Defendants assertion of the advice of counsel defense. *See* ECF No. 329, at 26. However, Defendants ignore the key component of a successful advice of counsel defense: reasonableness. Unsurprisingly, Defendants' Motion does not address *at all* that Defendants must establish a "'good faith'" reliance on the advice of counsel, including that the advice must be sufficiently supported as to be acceptable to a "'reasonable prudent person.'" ECF No. 236, at 12 (quoting *Sheetz Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256, 264 (W. Va. 2001), *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015), and *Powers v. Goodwin*, 374 S.E.2d 701, 705 n.8 (W. Va. 1984)). Plaintiffs have challenged the reasonableness of Defendants reliance on the advice of their counsel, attorney Bryan Vroon, throughout this litigation. Plaintiffs maintain that Defendants did not reasonably or in good faith rely on advice of counsel obtained after a fair and accurate disclosure to counsel of the facts on which the advice is sought. *See Tuomey*, 792 F.3d at 392.

By way of discovery, Plaintiffs have likewise discovered ample evidence indicating that Defendants did not disclose pertinent facts regarding the allegations in the underlying qui tam

complaint to Mr. Vroon. In fact, Defendants intentionally omitted information regarding the declination of their case by a previous, prominent law firm, when recruiting attorney Vroon to their cause. *See* Initial Letter. Defendants did not disclose to Mr. Vroon that the other firm, P&C, declined to participate in the underlying qui tam due to a *lack of evidence* and *lack of an inside man*, both of which P&C believed were necessary to represent in Defendants' claims. *See* ECF No. 236-1, at 138; *see also* Exhibit 1. After it was filed, and the DOJ conducted its multi-year investigation, the Government chose not to intervene in the Underlying Action finding a lack of support for the claims. *See* Exhibit 8.

Moreover, even if Defendants had disclosed pertinent information—which they did not—their counsel's failure to independently verify any of the allegations contained in the underlying complaint render his advice unreasonable. Mr. Vroon testified that he did nothing to test the veracity of his client's statements and "support" for the allegations in the underlying *qui tam*. *See* Exhibit 21, at 28-29, 58-60. Mr. Vroon likewise did not verify the authenticity or accuracy of the documents provided to him by Defendants. *Id.* Defendants cannot rely on advice of counsel where that advice was procured by Defendants' cherry-picking of facts to support their allegations. To permit such expedition would allow a party relying on the advice of counsel defense to receive "conflicting recommendations" from other counsel, pick the "preferred advice," "discard the rest," and rely on whatever advice is most helpful to them. *See In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006). Because there is a dispute as to whether Defendants' reliance on Mr. Vroon's advice was reasonable or made in good faith, summary judgment is inappropriate at this time based on the advice of counsel defense. *See Stewart v. Sonneborn*, 98 U.S. 187, 195 (1878) (finding that whether a party reasonably relied on the advice of his counsel, is a question for the jury).

**3. Plaintiffs' tortious interference claim is not precluded as Defendants did not act with a proper purpose when initiating the Underlying Action.**

Under West Virginia law, a claim for tortious interference exists where the plaintiff can demonstrate "(1) [the] existence of a contractual or business relationship or expectancy; (2) an intentional act of improper interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *See* Syl Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395 (W. Va. 2008); Syl. Pt. 2, *Torbett v. Wheeling Savings & Trust Co.*, 314 S.E.2d 166 (W. Va. 1983). Discovery has verified that Defendants are liable for tortious interference.

In their Summary Judgment Motion, Defendants assert the defense of justification, or "proper purpose" in filing the *qui tam* complaint. *See* ECF No. 329, at 34. Defendants falsely claim that the facts are undisputed, and that those facts show that their *qui tam* was a justified attempt to fight fraud. *Id.*

The Fourth Circuit defines "absence of justification" as conduct that is carried out for an improper purpose, such as malice or spite, or through improper means, like deceit or misrepresentation. *See BCD LLC v. BMW Mfg. Co., LLC,* 360 Fed. App'x 428, 435 (4th Cir. 2010); *see also Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co*., F.2d 59, 62 (4th Cir. 1993). Defendants were not only motivated by an improper purpose—their hatred for MMH—but their initiation of the underlying *qui tam* was also based on material misstatements and blatant falsities. The specious *qui tam* complaint clearly demonstrates that improper means motivated Defendants to deprive Plaintiffs of their contractual and business relationships. As outlined above, neither Defendants nor their attorney did anything to verify the allegations contained in the underlying complaint—they did not speak with any physicians about their

compensation, did not look at critical compensation documents, and relied on hearsay as support for their allegations. *See* Exhibit 20, at 278-279; Exhibit 26, at 106-107, 215-221.

As explained above, the government's declination and facts uncovered in discovery prove that Defendants based their *qui tam* on falsehoods. *See* Exhibit 8. Defendants' assessment of Plaintiffs' physician compensation is one such example. Defendants' *qui tam* complaint indicated that MMH "do[es] not rely on fair market value assessment or experts at all." *See* Exhibit 6; Exhibit 10. Yet Defendants King and Kruger testified that not only did they not know whether MMH had obtained or conducted FMV assessments, they did not care whether MMH did or did not do so. *See* Exhibit 26, at 145–47, 282–85; Exhibit 20, at 117–19. That is one of many allegations included in Defendants' *qui tam* complaint that was incorrect and based on blatant falsities. Defendants used false or materially misstated information to promote a *qui tam* action against Plaintiffs. That *qui tam* was initiated as a way for Defendants to "level the playing field" and execute their hatred for Plaintiffs. *See* Exhibit 26, at 34-35; Exhibit 20, at 148-149. By filing the *qui tam,* Defendants hoped to—and did—harm Plaintiffs' business relationships and reputation. *See* Exhibit 20, at 85-86.  Plaintiffs have clearly provided ample evidence in support of their claim for tortious interference and Defendants' Summary Judgment Motion as to that claim should be denied.

### 4.   The record likewise establishes that Defendants are liable for abuse of process.

Abuse of process exists where an individual or individuals willfully or maliciously "misuse or misappl[y] lawfully issued process to accomplish some purpose not intended or warranted by that process." *See* Syl. Pt. 2, *Wayne Cnty. Bank v. Hodges*, 338 S.E.2d 202 (W. Va. 1985) (citation and internal quotation marks omitted). The gravamen of an abuse of process claim is "not commencing action or causing process to issue without justification, but misusing,

or misapplying process justified in itself for an end other than that which it was designed to accomplish." *See Preiser v. MacQueen*, 352 S.E.2d 22, 28 n.8 (citation and internal quotation marks omitted). In other words, the "purpose for which the process is used . . . is the only thing of importance." *See id.*

Defendants argue, again, that they did not issue any process, much less abuse that process. *See* ECF No. 329, at 36. This Court has rejected that position four times and should do so again. Together, Defendants King, Roberts, and Kruger hatched and executed the plan to use false and materially misstated allegations to harm Plaintiffs via the Underlying Action, the accompanying a three-year investigation, and the reputational damage they knew would follow. *See* Exhibit 52. Defendants likewise provided information to Mr. Vroon which was not verified for accuracy or investigated whatsoever prior to its incorporation in the Underlying Complaint. *See* Exhibit 21, at 28-29, 58-60. Federal law *requires* the government to investigate alleged False Claims Act violations, and Defendants intended for the statutorily required investigation of their allegations to be lengthy and painful. 31 U.S.C. § 3730(a). Defendants simply cannot state that they did not issue process here—they filed the complaint and triggered the ensuing investigation.

Moreover, the record demonstrates that Defendants improperly used the *qui tam* process to promote false information and unsupported accusations with the express purpose of harming Plaintiffs. As outlined above, ample evidence exists to suggest that Defendants had an ulterior, improper purpose in initiating the underlying *qui tam* against Plaintiffs, and it had nothing to do with fighting fraud. *See* Exhibit 61; Exhibit 3, at 463. Importantly, Defendants used the investigation triggered by their *qui tam* to spread the word throughout the local community that MMH was under federal investigation. *See* Exhibit 3, at 770. In at least one instance, Defendant Kruger even used knowledge of the investigation to discourage a law student from working with

MMH's Compliance Office. *See* Exhibit 3, at 679. Camden Clark, Defendant Kruger's employer at the time of the *qui tam's* initiation, likewise spread word of the investigation to staff and medical personnel in the community, referring to that investigation as a "barrier to MMH's recruitment." *See* Exhibit 53, at 433.

Defendants' latest attempt at Summary Judgment again asks this Court to overlook what is not in dispute: that Defendants, particularly Defendant Kruger, used the *qui tam* as a vehicle to harm Plaintiffs' reputation in the community and spread word that Plaintiffs' were under investigation for fraud. *See* Exhibit 3, at 463, 857. Defendant Kruger likewise broke the mandatory seal—despite his role as the primary instigator of the underlying action—so that he could gossip with people throughout the community in an effort to ensure that Marietta Memorial "[went] down hard." *See id.*, at 770; *see also* Exhibit 59, at 173.

Defendants are not entitled to summary judgment as they misapplied lawfully issued process to accomplish their goal of harming Plaintiffs and continued to pursue that initiative well after their initial issuance of process.

## 5. Defendants' actions constitute fraudulent legal process under W. Va. Code § 61-5-27.

Violations of § 61-5-27a include, among other things, "knowingly engag[ing] in a fraudulent official proceeding or legal process" and "knowingly caus[ing] a public official or employee to file . . . a fraudulent claim, . . . complaint [or] other legal process, including those issued as a result of a fraudulent official proceeding." *Id.* at § 61-5-27a(b) & (c). The violator is liable for the "injury or loss to person or property . . . and for reasonable attorney's fees, court costs and other expenses incurred as a result of [pursuing a § 61-5-27a(h) civil claim]." *Id.* at § 61-5-27a(h). The West Virginia Legislature clarified, however, that the remedies provided under § 61-5-27a are not exclusive. *See id.*

In less than two paragraphs, Defendants ask this Court to overlook the countless examples of their own knowing engagement in a fraudulent legal process. Plaintiffs specifically alleged—and discovery has proven—that Defendants knowingly agreed to harm Plaintiffs by organizing, initiating, and pursuing the Underlying Action based on false, materially misstated, and unsupported allegations—none of which had been independently verified by Defendants or their counsel prior to the initiation of the underlying complaint. Moreover, as outlined above, discovery has revealed that countless allegations contained with the Underlying Complaint are false. Had Defendants, or their counsel, engaged in any kind of investigation into the veracity of their own allegations, they would have discovered that falsity. Instead, Defendants compiled rumors and blatant falsities and presented them as facts.

Not only were the allegations in the underlying complaint based on material misstatements and blatant falsities, but Defendants continued to pursue their fraudulent scheme after issuing that process by conferring with federal investigators throughout the years-long investigation. *See U.S. v. Chorman*, 910 F.2d 110, 111 (4th Cir. 1990) (holding that acts and statements in furtherance of a conspiracy may be attributed to all conspirators); *see also* ECF No. 322; Exhibit 59. Defendants knowingly engaged in fraudulent conduct in violation of § 61-5-27a. *See* ECF No. 107, at ¶¶ 2, 40, 54-56; *see also* W. Va. Code § 61-5-27a(a) (incorporating definitions from § 61-5-27); *see id.* at § 61-5-27(a) (defining "fraudulent," "legal process," and "official proceeding"). As the record demonstrates, Defendants involvement in the underlying *qui tam* was unlawful and illegitimate, and Defendants' request for judgment as a matter of law must fail.

6. **Defendants worked in concert to intentionally harm Plaintiffs and are thus liable for engaging in a civil conspiracy.**

As detailed extensively above, Defendants Kruger, King, and Roberts worked in concert to harm Plaintiffs. *See e.g.,* Exhibit 52. A civil conspiracy occurs when a combination of two or more persons, by concerted action, set out to accomplish some purpose by unlawful means. Syl. Pt. 18, *O'Dell v. Stegall*, 703 S.E.2d 561 (W. Va. 2010) (citation omitted). The West Virginia Supreme Court has recognized conspiracy as a separate claim. *Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-Day Saints*, 801 S.E.2d 443, 447 (W. Va. 2017).

At the very least, the material facts of this case demonstrate that there is a dispute as to whether Defendants committed any wrongdoings when initiating, pursuing, and filing the Underlying Action in order to harm Plaintiffs. Based on that dispute, Defendants' request for judgment as a matter of law on the conspiracy claim is inappropriate. Because Defendants set out to harm Plaintiffs—and did so—they are liable for engaging in a civil conspiracy.

7. **Summary Judgment on Plaintiffs' claims because of a supposed lack of an expert would be improper.**

In perhaps their strangest argument, Defendants contend that they are entitled to summary judgment because Plaintiffs have failed to produce a legal expert with the expertise necessary to explain the "intricacies of the complex field of *qui tam* litigation." *See* ECF No. 329, at 39. It is true that Plaintiffs have not produced an expert who will opine as to, the law of *qui tams*, the government's declination, or what conclusions the government reached in choosing to dismiss the underlying action. Why? Because such "expert" testimony is improper.[4] Defendants cannot point to a single case in which a legal expert has been qualified and permitted

---

[4] Indeed, Plaintiffs will be shortly filing a *Daubert* motion to exclude the testimony of both of Defendants' disclosed experts, Mr. Vroon and Mr. Nettles.

to opine on such issues to a jury—that's what lawyers and the Court are for.[5] Plaintiffs do not have to present a rebuttal expert to address two improper "expert opinions" in order to survive summary judgment.

Defendants have disclosed Vroon as an "expert on the factual and legal basis of the Underlying Complaint." *See* ECF No. 329, at 21. In other words, Vroon purports to be an *expert* on the Complaint that he compiled, drafted, and ultimately filed on behalf of Defendants. As will be outlined in forthcoming motion, it is improper to elevate Vroon's second-hand account to the authority of an expert. *See United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (explaining that an expert opinion must be "an opinion informed by the witness' expertise").

It is likewise unhelpful for an attorney to tell the jury, as an expert, that he believes that the Complaint he filed — but did nothing to verify the veracity of — is meritorious. Of course, Mr. Vroon contends that the underlying complaint had merit. However, as outlined above, Mr. Vroon's reliance on only the words of his clients and few documents they provided him does not render his advice, or his testimony now, reasonable or reliable. *See* Exhibit 21, at 28-29, 58-60. Simply put, Mr. Vroon is opining as to his own credibility and as to the applicability of Defendants' advice of counsel defense — neither of which are proper grounds for expert testimony. *See United States v. Allen*, 716 F.3d 98, 105–06 (4th Cir. 2016) (issues of credibility are not the proper subject of expert testimony). Moreover, because Vroon failed to investigate the allegations contained within the Underlying Complaint, his testimony would amount to little more than a second-hand account of the facts, which have been proven false. *See United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003) ("Simply by qualifying as an 'expert,' the witness attains unmerited credibility when

---

[5] None of the litany of cases cited by Defendants demand summary judgment where a party's expert is not rebutted by another expert.

testifying about factual matters from first-hand knowledge."). Mr. Vroon's expert opinion would give Defendants' story a presumption of truth that it does not deserve and, under Rule 702, cannot receive. Mr. Vroon's testimony likewise cannot be used to tell the jury how to apply the law. It is clear that Mr. Vroon intends to testify that MMH defrauded the government as set forth in the Underlying Complaint. *See* ECF No. 329, at 39. Longstanding case law, however, establishes that "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *See United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). The Court should not allow Vroon to expertly opine that the inaccurate allegations of the Underlying Complaint give credence to Defendants' actions.

Similarly, the expert testimony that Mr. Nettles intends to offer is improper and Plaintiffs need not rebut it. According to Defendants, Mr. Nettles will opine as to the Government's declination and specifically, that a declination does not render the underlying *qui tam* suit, meritless. *See* ECF No. 329, at 39. However, that opinion, like his report, will wholly ignore what the record demonstrates — that representatives from the DOJ *told* Mr. Vroon that they could not substantiate Defendants' allegations. *See* Exhibit 17, at 105–09; *see also* Exhibit 8. Instead of using those contemporary statements regarding the DOJ's declination, Mr. Nettles will attempt to put words in the DOJ's mouth and offer his own opinions as to why the government did or did not pursue Defendants' case. Nettles likewise intends to tell the jury to ignore Mr. Vroon's email — and thus the words of the DOJ representatives — and instead believe that the DOJ merely declined to intervene because they could.

Plaintiffs will seek to exclude both Mr. Vroon and Mr. Nettles as experts, and certainly do not need to rebut those improper opinions via their own experts because the evidence rebuts their opinions. In fact, a single document does just that: Exhibit 8. That email reflects that Mr. Vroon

informed Defendants that the Government believed the allegations were unsupported by the evidence. Defendants are not entitled to summary judgment based on the opinions of two improper experts whom Plaintiffs have moved to exclude.

### 8.   Defendants are not immune to any of Plaintiffs' claims based on the *Noerr-Pennington* doctrine.

As this Court ruled previously, the *Noerr-Pennington* doctrine does not shield Defendants from liability for their tortious behavior.[6] Again, Defendants misapprehend *Noerr-Pennington's* limited protections, and overlook the fact that the doctrine does not immunize their role in the underlying qui tam.

Here, the Underlying Action was premised entirely on false and materially misstated statements.  Courts within this Circuit have been clear that such allegations "'are not the type of petitioning activity protected by the *Noerr-Pennington* doctrine.'" *E.g.*, *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F.Supp.2d 635, 641 (D. Md. 2009) (citation omitted). Where a party makes knowingly false statements, those statements are not protected by the doctrine. *Id.* at 640 n.3. Even the failure to conduct a "factual investigation before filing suit" or to confirm the accuracy of allegations constitutes an "abus[e of the] right to petition the courts beyond the point of constitutional protection." *See I-Minerals USA, Inc.*, No. 1:15-cv-00094-MOC-DLH, 2015 WL 5457840, at *4.  As outlined above, neither Defendants nor their attorney conducted a factual investigation before filing the underlying action to confirm the accuracy of the allegations contained therein.

---

[6] There is no dispute that the *Noerr-Pennington* doctrine does not apply to immunize a defendant from an abuse of process claim. *See* ECF No. 141, at 4 n.1; *see also Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 400 (4th Cir. 2001) (explaining that *Noerr-Pennington* would not apply upon a "showing of clear abuse of process" (citation and internal quotation marks omitted)).

The First Amendment does not shield *false statements*. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("[T]here is no constitutional value in false statements of fact."); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("There is no first amendment protection for furnishing . . . false information to an . . . adjudicatory body."); *Friends of Phil Gramm v. Ams. For Phil Gramm in '84*, 587 F.Supp.769, 776 (E.D. Va. 1984) ("The First Amendment does not protect knowingly false statements."). Additionally, the *Noerr-Pennington* doctrine "does not provide immunity for intentional misrepresentations made in litigation." *Fritz v. Resurgent Capital Servs.*, 955 F.Supp.2d 163, 176 (E.D.N.Y 2013). As detailed above, discovery establishes that material allegations contained in the Underlying Complaint are false. Because they failed to investigate the veracity of their allegations, and because those allegations were then proven false, Defendants cannot rely on *Noerr-Pennington* to escape liability for the underlying action.

Furthermore, even if the *Noerr-Pennington* doctrine were to apply, it would still not protect Defendants because of the "sham litigation" exception. That exception applies—and deprives all three Defendants of *Noerr-Pennington*'s protection—when the operative suit is (1) "objectively baseless" and (2) where the subjective motivation for it concerned attempted interference with business relationships through a government process. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (*"PREI"*).

Here, the Underlying Action, as well as Defendants' initiation and pursuit of it, satisfies both prongs of the "sham litigation" exception. As to the first prong, the record clearly establishes that Defendants, in concerted effort with each other, initiated and pursued the Underlying Action based on falsities and material misrepresentations to harm Plaintiffs. *See* ECF No. 107, at ¶¶ 33-37. This Court has concluded that relying on such a ""fraudulent scheme""

precludes "'objective reasonableness.'" *CSX Transp., Inc. v. Peirce*, 974 F.Supp.2d 927, 943 (N.D.W. Va. 2013) (citation omitted). In this case, this Court has already correctly determined (multiple times) that, based on Plaintiffs' allegations — which discovery has substantiated — Defendants lacked probable cause in initiating and pursuing the Underlying Action. *See* ECF No. 40, at 11-14 (determining sufficiently pled malicious prosecution claim); ECF No. 51, at 3 (rejecting nearly all of Defendants' reconsideration arguments, including based on probable cause); ECF No. 134, at 6-8 (again determining sufficiently pled malicious prosecution claim).

Plaintiffs also satisfy the second prong of the "sham litigation" exception, as Defendants "willfully and maliciously used the DOJ's *qui tam* investigative process" by providing information "based on falsities, material misstatements, and unsupported accusations"—actions that are criminal. *See* ECF No. 107, at ¶¶ 94, 95 (ECF No. 4, ¶¶ 46, 90); *see also* 18 U.S.C. § 1001 (criminalizing false statements given to Government officials). Such alleged conduct is "'a willful act [that is] not authorized by the process [and is] aimed at an objective not legitimate in the use of the process.'" *See Preiser v. MacQueen*, 352 S.E.2d 22, at 28 n.8 (W. Va. 1985) (citation omitted). As discovery has revealed, Defendants did so with the express purpose of harming Plaintiffs — or the "evil empire," according to Defendant Kruger — impeding Plaintiffs' business, and altering their relationships with patients and medical personnel in the Mid-Ohio Valley. *See* Exhibit 3, at 463; ECF No. 107, at ¶¶ 33-35, 38, 40, 56. This Court has already concluded that an "abuse of process . . . satisfies the sham exception's second prong." *Peirce*, 974 F.Supp.2d at 943. As this Court has already ruled, Defendants are not shielded by the *Noerr-Pennington* doctrine.

9. **Plaintiffs' claims are not preempted by the False Claims Act.**

By way of their Motion for Summary Judgment, Defendants make their *fourth* — albeit identical — attempt at an unusual preemption argument under the False Claims Act. However, rather than reiterate tired arguments, Defendants simply cite by incorporation their prior arguments, which this Court rejected. Without any additional support, Defendants maintain that the inapt and distinguishable caselaw they cited previously should be relied upon by this Court to preempt Plaintiffs' claims. *See* ECF No. 329.

Given Defendants incorporation, Plaintiffs likewise incorporate their prior arguments against preemption, as well as this Court's prior rejection of them. As this Court correctly noted, Defendants failed to "cite to any case in which a court found that the FCA in fact preempted state remedies for improper conduct — presumably because there are none." *See* ECF No. 40 at 5; *see also* ECF No. 134; ECF No. 183. Defendants' preemption contentions simply boil down to their continued disagreement with this Court's application of the law.

## CONCLUSION

For the reasons provided above, Plaintiffs respectfully request that this Court deny Defendants' Joint Motion.

Dated: February 6, 2023

**MARIETTA AREA HEALTHCARE, INC., MARIETTA MEMORIAL HOSPITAL, and MARIETTA HEALTHCARE PHYSICIANS, INC., By Counsel**.

 _/s/ Michael B. Hissam_____
Michael B. Hissam (WVSB #11526)
Isaac R. Forman (WVSB #11668)
Max C. Gottlieb (WVSB #13201)
Emily L. Ford (WVSB #13885)
HISSAM FORMAN DONOVAN RITCHIE PLLC

P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
iforman@hfdrlaw.com
mgottlieb@hfdrlaw.com
eford@hfdrlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MARIETTA AREA HEALTHCARE, INC.,
MARIETTA MEMORIAL HOSPITAL, and
MARIETTA HEALTHCARE PHYSICIANS, INC.,**

|  |  |
|---|---|
| **Plaintiffs,** | **Civ. Action No. 5:21-cv-00025** |

**v.**

**MICHAEL A. KING, and
MICHAEL D. ROBERTS, M.D., and
TODD A. KRUGER,**

       **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel does hereby certify that on the 6th day of February, 2023, he electronically filed ***Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will send notification of that filing to the following:

Evan R. Kime, Esquire
Colton J. Koontz, Esquire
Jackson Kelly, PLLC
500 Lee Street, East, Suite 1600
Charleston, WV 25301
Evan.kime@jacksonkelly.com
Colton.koontz@jacksonkelly.com

Marc E. Williams, Esquire
Robert L. Massie, Esquire
Shaina D. Massie, Esquire
Nelson Mullins Riley & Scarborough
PLLC
949 Third Ave., Suite 200
P.O. Box 1856
Huntington, WV 25701
Marc.williams@nelsonmullins.com
Bob.massie@nelsonmullins.com
Shaina.Massie@nelsonmullins.com

J. Victor Flanagan, Esquire
Jonathan J. Jacks, Esquire
Pullin, Fowler, Flanagan, Brown & Poe, PLLC
252 George Street
Beckley, WV 25801
vflanagan@pffwv.com
jjacks@pffwv.com

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)